## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| **NANCY BATAL-SHOLLER**,      ) | |
|         ) | |
|      Plaintiff,      ) | |
|         ) | |
| **v.**      ) | |
|         ) | **Case No.** |
| **MARILYN BATAL,** Individually      ) | |
| and as Personal Representative of      ) | |
| the Estate of Edward B. Batal, Sr.,      ) | |
|         ) | |
| **THE BATAL FAMILY LIVING**      ) | |
| **TRUST,**      ) | |
|         ) | |
| **BATAL CORP.,** d/b/a Batal      ) | |
| Corporation and/or The Batal      ) | |
| Agency,      ) | |
|         ) | |
|      and      ) | |
|         ) | |
| **THE EDWARD B. BATAL**      ) | |
| **DEFINED CONTRIBUTION**      ) | |
| **PLAN,**      ) | |
|         ) | |
|      Defendants      ) | |

## <u>PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL</u>

Plaintiff Nancy Batal-Sholler, by and through undersigned counsel, hereby complains against Defendants as follows:

### <u>INTRODUCTION</u>

1. This action alleges civil RICO Act violations and a RICO conspiracy; ERISA interference, breach of fiduciary duty, and a claim for benefits; fraud and fraudulent transfers; negligent misrepresentation; tortious interference with both an

1

expectancy of inheritance and a prospective economic advantage; unpaid wages; and misappropriation of trade secrets against Defendants.

2.      This action arises from the devastating economic loss that Plaintiff Nancy Batal-Sholler ("Nancy") suffered after she spent more than thirty years building and running her father's insurance company, only to have her hard work, profits, wages, retirement benefits, and entire client list eviscerated by Defendants' greed. Defendants conspired to defraud Nancy of employee benefits and wages, and then stole the company she worked for thirty years to build right out from under her. Before Defendants stole everything from Nancy, they conspired to defraud Nancy and the United States Government of employer-paid payroll taxes by intentionally misclassifying Nancy as an independent contractor instead of an employee. This fraudulent misclassification also enabled Defendants to deprive Nancy of 401k benefits under the Edward B. Batal Defined Contribution Plan.

3.      The present action evolved from litigation filed by Nancy against her late father, Edward B. Batal, Sr. ("Ed"), in the York County Superior Court ("YCSC"). The YCSC action alleged breach of contract and equitable claims related to the sale of the insurance business to a third party despite multiple promises to Nancy over more than thirty years that the agency would be "yours and only yours" someday. That action was brought when Nancy's father was still alive, before many of the events described herein occurred. The instant litigation is not duplicative of the YCSC action because it involves different parties, different legal theories, and new events that have developed since Ed's death.

2

4.     Since Ed's death, it has become clear that Defendants were engaged in a RICO Act conspiracy and an ongoing pattern of racketeering activity designed to defraud Nancy, with multiple predicate RICO acts occurring over the past four years.

5.     In the YCSC action, Nancy obtained an *ex parte* order of attachment and trustee process against the goods, credits, and property of Defendants. That attachment secured at least $500,000 toward any judgment that Nancy obtained against her father, including at least five separate real properties owned by Ed and/or Marilyn.

6.     In order to obtain relief from the attachment, Defendants' attorneys in the YCSC action made false, frivolous, and outrageous allegations against Nancy's former counsel. Those false and frivolous allegations were intentionally designed to convince the YCSC to grant a motion for relief from attachment. Once the YCSC dissolved the attachment, Defendants fraudulently transferred assets from the Batal Family Living Trust and sold them, with the express intent of shielding such assets from Nancy.

7.     Before Ed's death, and around the time that he sold the business to a third party despite years of promises to Nancy that she would own the Agency, Ed and Marilyn transferred all of their assets to the Batal Family Living Trust. Marilyn then convinced Ed to disinherit Nancy from the trust, thereby ensuring that Nancy received none of the multi-million-dollar estate or proceeds from the sale of the business she had built for decades.

8.     The final coup de grace occurred in 2019, when Marilyn Batal breached her fiduciary duties and drained the Edward B. Batal Defined Contribution Plan of nearly $600,000 to additionally shield those assets from Nancy's reach. Nancy would have received benefits from this plan if she had been properly classified as an employee instead of an independent contractor. More importantly, Nancy should have had ownership and control over the assets of the plan as a shareholder, and eventually the sole surviving shareholder, of Batal Corp.

## **THE PARTIES**

9.     Plaintiff Nancy Batal-Sholler ("Nancy") is an individual residing in the Town of Acton, County of York, and State of Maine.

10.     Nancy's father, Edward B. Batal, Sr. ("Ed") resided in the Town of Springvale, County of York, and State of Maine up until the date of his death on March 24, 2019.

11.     Ed's wife, Defendant Marilyn Batal ("Marilyn"), is the duly appointed Personal Representative of his Estate and she is the substituted defendant in the YCSC action that alleges breach of contract, unjust enrichment, and quantum meruit against Ed.

12.     At all times relevant to the facts alleged herein, Defendant Batal Corp., d/b/a Batal Corporation and/or The Batal Agency, was an insurance agency located in Sanford, Maine, and a duly organized Maine business corporation with a principal place of business in Sanford, Maine, which was engaged in interstate commerce.

## JURISDICTION AND VENUE

13.     Venue is proper in this Court because Plaintiff resides in York County, where Defendants' principal place of business was also located, and many of the activities described herein occurred in the County of York and State of Maine.

14.     This Court has federal question subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331.

15.     This Court has supplemental jurisdiction over the remaining claims advanced herein pursuant to 28 U.S.C. § 1367.

## BACKGROUND FACTS

## HISTORY OF BATAL CORP.

16.     Plaintiff Nancy Batal-Sholler (hereinafter, "Plaintiff" or "Nancy") is the adult daughter of the late Edward B. Batal, Sr. (hereinafter, "Ed").

17.     Ed founded an insurance agency in Sanford Maine in the 1960s, called Batal Corp. and/or Batal Corporation d/b/a The Batal Agency, an insurance agency in Sanford, Maine.

18.     Batal Corp. and/or/d/b/a Batal Corporation, and/or/d/b/a The Batal Agency, together with any other party or entity associated with Defendants that employed Nancy from 1983 until the date she left employment in December of 2017, is hereinafter referred to collectively as "the Agency."

19.      In 1983, Ed asked Nancy to relocate back to Maine with her husband to work at the Agency. Ed wanted Nancy to assist him with transitioning the Agency from being a Nationwide Insurance Agent to a multi-company insurance agency.

20.     To entice Nancy's return to Maine and employment with the Agency, Ed promised Nancy that she would someday take over the business. Specifically, Ed promised Nancy that he would retire around the age of 62 and she relied on that promise.

21.     In 1983, Nancy was living in Japan with her husband. Nancy's husband David was a United States Marine Corps officer stationed in Okinawa at the time.

22.     Nancy and David relied on Ed's promises in agreeing to return to the United States so that Nancy could help Ed run the Agency and become an independent insurance company. In order to return to Maine, David had to resign from his Marine Corps post as a career officer. He was honorably discharged from active duty in 1983 and remained in the reserves.

23.     Nancy returned to Maine and worked for the Agency between 1983 and 1985. Ed asked her to get more experience in the insurance industry, so Nancy also worked long hours gaining experience for another company.

24.     By 1985, Nancy was working full time for the Agency. She continued to work full time for the Agency until her termination on December 31, 2017.

25.     In or about 1990, Ed began leaving the United States to travel abroad for extended periods of time, leaving Nancy in charge to run the Agency and develop business, while Ed maintained control over bookkeeping.

26.     From the early 1990s until the time that she was fired from the Agency in December of 2017, Nancy was the only significant producer of business and the only person performing substantive work for the Agency.

6

27.     Ed was absent from the Agency on an almost continuous basis from the early 1990s until the date of his death on March 24, 2019.

### ED'S PROMISES: THE FIRST AND SECOND BATAL WRITINGS

28.     In 2003, Ed reached the age of 62, which is when he had previously promised Nancy he would retire and transition full ownership and control of the Agency to her.

29.     To prepare for the sale of the Agency, in late 2002, Nancy and/or Ed prepared a letter that would go out to all clients letting them know that full ownership and control was being transitioned over to Nancy.

30.     Ed met with Nancy in April of 2003 to discuss his plans for the future, including when he would transition full ownership and control of the Agency to Nancy.

31.     During the April 2003 meeting, Ed revealed that he had changed his mind about retiring. Ed told Nancy that he wanted to continue receiving income from the business.

32.     Ed knew that his decision not to transition ownership and control of the Agency to Nancy in 2003 was contrary to the promises he had made all along, and on which she relied to her detriment, for years.

33.     During this meeting, Ed promised Nancy that he would gift her forty percent of stock in the company.

34.     Ed apologized to Nancy for changing his mind about retiring. He met with Nancy and wrote out two handwritten documents memorializing his promises to

her, for the purpose of inducing her continued work for the Agency. During their meeting, Nancy did not write any notes on the documents that Ed drafted and signed.

35.     The first document that Ed handwrote to Nancy, which has been referred to in previous litigation as the "First Batal Writing," was dated April 18, 2003, and signed by both Ed and Nancy.

36.     The First Batal Writing contained promises from Ed that if Nancy continued to work at the Agency, she would own it someday.

37.     The First Batal Writing began with a summary of what Ed had observed about the growth of the Agency in recent years.

38.     Because Ed had promised Nancy that he would turn the Agency over to her by 2003, Ed recognized his failure to live up to that promise and made new promises, writing: "What about Nancy. What can I do to save face? I know to satisfy you and myself is not going to be easy. Let's try!"

39.     The First Batal Writing contained a numbered list of income and growth projections for the Agency. To induce Nancy's continued work for the Agency while he traveled abroad and did essentially no work in insurance sales, Ed agreed to sell Nancy the Agency in the future. If Nancy grew the Agency beyond the 2002 income level of $449,198.27, he would "freeze the value (sales) of the Batal Agency at 2 times" the income level.

40.     The foregoing language from the First Batal Writing contemplated selling the Agency to Nancy at a price that would be consistent with industry

standards at the time—twice the previous year's income. By the time that Ed sold the Agency to a third party, the sale price was less than twice the previous year's income.

41.    The First Batal Writing did not discuss what purchase price would be offered to Nancy to buy the Agency in the event that the income level decreased over time.

42.    The First Batal Writing must be construed against Ed as the drafter of the agreement.

43.    Specifically, Ed made the following promise to Nancy in the First Batal Writing: "In time this agency will be yours and only yours when I am no longer in need [of] this income."

44.    Ed also promised in the First Batal Writing to offer a transfer of stock to Nancy as soon as his lawyer could figure out the "best way tax wise" to do so. He then acknowledged that he had let Nancy down.

45.    Nancy understood, agreed, and relied on Ed's promise that he was going to transfer stock in the Agency to her, and he was simply waiting on his attorney or accountant to determine the best way to proceed.

46.    Nancy believed that Ed intended to transfer forty percent of the stock in the Agency to her, and this promise induced her to continue working for the Agency even after Ed decided not to retire in 2003.

47.    Ed also acknowledged that his breach of the prior agreement to transfer the Agency to Nancy by the age of 62, upon which she had relied since 1983, was "not what you want to hear."

9

48.     On the same day, April 18, 2003, Ed gave Nancy another handwritten document with similar promises and agreements, which he signed (hereinafter referred to as "the Second Batal Writing").

49.     The Second Batal Writing reiterated that, in the event the income of the Agency grew over time, Ed would freeze the price of the Agency so that it was not the industry standard of twice the previous year's income, but twice the income level in 2002.

50.     Because Ed did not address in either the First or Second Batal Writing what would happen if the Agency's income decreased over time, the concept of freezing the value at two times 2002 income was not a material term to the parties' agreement. Alternatively, the term agreed to by the parties of selling the Agency for twice the previous year's income was not dependent on the 2002 income level.

51.     The material term of the Second Batal Writing, and the consideration or inducement for Nancy's continued work for the Agency, was as follows: "I want you to own or have the Batal Agency as soon as I do not need any more. No one will ever own the Batal [Agency] other than Ed B. or Nancy B."

52.     After their meeting on or about April 18, 2003, Nancy signed the First Batal Writing. Thereafter, she wrote a note on the top of the First Batal Writing that reiterated the terms discussed: "Freeze price @ 900,000."

53.     Nancy also wrote notes to herself about the discussion with her father, and the promises he made during their meeting. For example, Nancy wrote: "If we don't predetermine value, will my purchase price go up"?

10

54.     Nancy's notes also discuss "scenarios" about the transfer of stock, stating: "This is Charlie's way."

55.     Nancy also wrote a note stating: "You can give inheritance tax free."

56.     Nancy made copies of the First and Second Batal Writings.

57.     On or about April 19, 2012, Nancy gave Ed a copy of the Second Batal Writing and made a note that she has provided Ed with a copy of the document on the top right-hand corner.

58.     Nancy provided Ed with a copy of the Second Batal Writing in 2012 because she wanted to remind him of the promise that no one else would ever own the Agency.

59.     In reliance on her father's promises, Nancy continued to work for the Agency while Ed derived significant income from the Agency even though he performed no work or business generation to earn that income.

60.     In reliance on her father's promises, Nancy worked hard and provided her father with an ongoing stream of income. Nancy's reliance on her father's promises were detrimental to her, because she could have left the Agency and taken all of her clients/customers with her at any time.

61.     Alternatively, Nancy and Ed entered into a valid and binding contract, with a meeting of the minds as to all material terms and a mutual assent to be bound, for Nancy to continue performing work for the Agency in exchange for future ownership and control.

11

62.     Nancy relied on and was induced by Ed's promises to continue working for the Agency, foregoing other business and income pursuits, in exchange for the promise that she would one day own the Agency for a reasonable price.

63.     Although Ed performed little or no work as an insurance agent or business generator for the Agency between the 1990s and 2017, Ed had financial control over the Agency during that period.

64.     Between the 1990s and 2017, Ed deprived Nancy of the independent judgment and discretion to exercise control over the financial management of the Agency, including bookkeeping and high-level management decisions.

65.     Ed handled the bookkeeping and finances for the Agency, even in years when he was traveling abroad, until 2017 when his health declined, and he could no longer perform any work.

66.     Prior to 2017, during Christmas dinners for Agency employees and on other occasions, Ed told everyone present that "this [the Agency] will all be Nancy's someday."

## MISCLASSIFICATION OF NANCY AS AN INDEPENDENT CONTRACTOR

67.     Prior to 2013, Nancy worked for Samia Realty of Maine as a realtor while she also worked for the Agency.

68.     In 2013, Ed demanded that Nancy give up her separate job as a realtor and focus her efforts exclusively on the Agency.

69.     Marilyn had a longstanding pattern of trying to deprive Nancy of profits, earnings, and benefits that she was rightfully owed.

70. Because Ed was gone most of the time, Marilyn asked another employee of the Agency, Donna Shaw, with whom Marilyn had a close personal relationship, to keep track of Nancy's hours worked, time in the office, vacations or days off, and lunch breaks, thereby destroying the salary basis test.

71. Between November 2015 and the date of her termination in December of 2015, Nancy worked an average of roughly 10 hours of overtime each week, but she was never paid overtime.

72. Although Nancy was the only significant producer of insurance business at the Agency, and Ed did not do any real work on a day-to-day basis, his bizarre control over the Agency deprived Nancy of independent judgment and discretion on matters of significance at the Agency.

73. For instance, Nancy repeatedly recommended that the Agency invest more in technology and an online presence to modernize the business and attract clients. Nancy knew that the Agency would lose money year after year if these steps were not taken, but Ed refused.

74. In refusing to grow the Agency's online presence and technology, Ed not only deprived Nancy of independent judgment and discretion, but he also interfered with the profits owed to Nancy pursuant to their longstanding agreements.

75. Regardless of whether Nancy met an exemption from the requirement to pay overtime under the administrative duties test or any other basis, no such exemption applies to Nancy's employment because Defendants intentionally misclassified her as an independent contractor rather than an employee, to defraud

13

her of benefits and overtime and defraud the U.S. Government of employer-paid payroll taxes.

76.    Because the Agency was not paying its portion of payroll taxes for Nancy's employment, she had to pay an extra 7.5% in taxes on her wages for more than thirty years of employment, which the Agency should have paid.

77.    The Agency engaged in the RICO predicate acts of mail fraud and/or wire fraud on a repeated, regular basis in filing tax returns, processing W-2s for other employees besides Nancy, and misrepresenting the status of Nancy's employment to the IRS out of greed.

78.    Defendant Batal Corp., by and through its co-conspirators Ed and Marilyn Batal, who aided and abetted the fraud described herein, knowingly conspired together to defraud Nancy by misclassifying her as an independent contractor rather than an employee, causing her to suffer not only lost wages and bonuses, but employee benefits, retirement plan compensation, and fringe benefits such as mileage reimbursement as well.

79.    For years, Defendant Marilyn Batal encouraged or demanded that Ed pay Nancy less money, to misclassify her as an independent contractor rather than an employee, to leave Nancy out of the Edward B. Batal Defined Contribution Plan, and/or to sell the Agency to someone other than Nancy.

80.    Ed knew that Nancy was not properly classified as an independent contractor. Upon information and belief, when Ed sold insurance for Nationwide, he did so as an independent contractor. This arrangement is typical in the insurance

industry. The independent contractor working for the insurance company is free to hire staff and obtain independent office space, supplies, and separate resources to run their own independent agency, which Ed did. The people working for the agency, however, are employees. While the insurance company may provide the same forms and support for all independent contractor agencies, this does not make the agents themselves employed by the insurance company. Ed knew of this distinction between independent contractor agencies and the people who worked in the Agency that he started in the 1960s, including Nancy.

81. The scenario where insurance agents are properly classified as independent contractors stands in sharp contrast to Nancy's employment with the Batal Agency. Nancy was employed by the Agency, not the insurance companies for whom she sold insurance. Nancy did not hire her own staff, purchase her own supplies, open her own office, or control her own finances or high-level business operations. In addition, Nancy's hours and places of employment were repeatedly controlled and tracked by the Agency, with Donna Shaw acting as an agent of Ed and Marilyn Batal.

82. According to the 2015 W-2s issued by the Batal Corp., the Agency had 4 employees in 2015: Edward B. Batal, Theresa Murphy, Donna Shaw, and Emily Sheffield.

83. Nancy received a 1099 from the Agency in 2015, reflecting $67,780.00 in income.

84. According to the 2016 W-2s issued by the Batal Corp., the Agency had 3 employees in 2016: Edward B. Batal, Theresa Murphy, and Donna Shaw.

85.     Nancy received a 1099 from the Agency in 2016, reflecting $70,102.50 in income.

86.     By the middle of 2017, Ed was ill and no longer capable of handling the finances or other high-level decision making for the Agency.

87.     Although neither an employee nor an officer of Batal Corp., Marilyn Batal took over bookkeeping for the Agency in 2017 rather than allowing Nancy to perform this function.

88.     By the middle of 2017, Ed and Nancy's communications had broken down irretrievably. Ed typically would not speak to Nancy, which Marilyn said was because Nancy "upset" Ed.

89.     When Ed insisted on speaking with his daughter, despite Marilyn's interference, Marilyn drove Ed to the Agency where Nancy met him outside in the car to communicate privately.

90.     Aside from these meetings in the car, Marilyn controlled all other communications by and between Ed and Nancy in 2017.

91.     Upon information and belief, Marilyn worked tirelessly on Ed to convince him that Nancy was incompetent or otherwise undeserving of just compensation and that she was incapable of running the Agency.

92.     In the middle of 2017, Nancy realized that she had been improperly classified as an independent contractor instead of an employee and if Marilyn convinced Ed to fire her, Nancy would never be able to collect unemployment. Nancy

therefore called the payroll company and changed her classification within the Agency from independent contractor to employee.

93.     For the first part of 2017, Nancy received 1099 income from the Agency, in the total amount of $45,332.90.

94.     According to the 2017 W-2s issued by the Batal Corp., the Agency had 4 employees in 2017: Edward B. Batal, Theresa Murphy, Donna Shaw, and Nancy Batal-Sholler.

95.     Nancy's W-2 wages for the second part of 2017 amounted to $33,923.19.

96.     Nancy's overall compensation in 2017 was $79,256.09.

97.     In the 5 weeks between November 22, 2015 and December 31, 2015, Nancy worked an average of 10 hours of unpaid overtime per week. With an annual salary of $67,780, divided by 52 weeks, divided by 40 hours per week, Nancy's regular rate of pay for purposes of calculating unpaid overtime in 2015 was $32.59. Multiplied by 1.5, Nancy's overtime rate for these 5 weeks in 2015 was $48.87. Multiplied by 10 hours per week, Nancy's unpaid overtime for 2015 amounts to $2,443.50.

98.     In 2016, Nancy's income was $70,102.50. Nancy worked an average of 10 hours of unpaid overtime per week in 2016. With an annual salary of $70,102.50, divided by 52 weeks, divided by 40 hours per week, Nancy's regular rate of pay for purposes of calculating unpaid overtime was $33.70. Multiplied by 1.5, Nancy's overtime rate for 2016 was $50.55. Multiplied by 10 hours per week, and 50 weeks out of the year (discounting 2 weeks of vacation), Nancy's unpaid overtime for 2016 amounts to $25,275.00.

99.    In 2017, Nancy's income was $79,256.09. Nancy worked an average of 10 hours of unpaid overtime per week in 2017. With an annual salary of $79,256.09, divided by 52 weeks, divided by 40 hours per week, Nancy's regular rate of pay for purposes of calculating unpaid overtime was $38.10. Multiplied by 1.5, Nancy's overtime rate for 2017 was $57.15. Multiplied by 10 hours per week, and 50 weeks out of the year (discounting 2 weeks of vacation), Nancy's unpaid overtime for 2017 amounts to $28,575.00.

100.    The estimated unpaid overtime from 2015 to the end of Nancy's employment with the Agency is approximately $56,293.50, multiplied by either two for the unpaid overtime violations alleged herein or by three for the unpaid minimum wages alleged herein as a result of misclassifying Nancy as an independent contractor instead of an employee.

101.    Plaintiff is entitled to additional unpaid wages as a result of her misclassification as an independent contractor, including 7.5% in payroll taxes that she had to pay as a so-called self-employed individual, fringe benefits and mileage, and other employee benefits.

## THE EDWARD B. BATAL DEFINED CONTRIBUTION PLAN

102.    Upon information and belief, Ed started the Edward B. Batal Defined Contribution Plan ("the Plan"), a single employer plan, in 1984.

103.    According to the Plan's Form 5500, in 2009 the Plan had 5 participants. The Plan had income in the amount of $85,063 in 2009, for a total of $501,754 in assets at year end.

104.    According to the Plan's Form 5500, in 2010 the Plan had 5 participants. The Plan had income in the amount of $83,333 in 2010, for a total of $567,310 in assets at year end.

105.    According to the Plan's Form 5500, in 2011 the Plan had 5 participants. The Plan had income in the amount of $29,068 in 2011. The Plan also paid benefits in the amount of $23,394 in 2011. At year end, the Plan held assets in the amount of $572,916.

106.    According to the Plan's Form 5500, in 2012 the Plan had 4 participants. The Plan had income in the amount of $63,838 in 2012. The Plan also paid benefits in the amount of $21,836 in 2012. At year end, the plan held assets in the amount of $614,900.

107.    According to the Plan's Form 5500, in 2013 the Plan had 4 participants. The Plan had income in the amount of $74,769 in 2013. The Plan also paid benefits in the amount of $24,259 in 2013. At year end, the plan held assets in the amount of $665,389.

108.    According to the Plan's Form 5500, in 2014 the Plan had 4 participants. The Plan had income in the amount of only $5,154 in 2014. The Plan also paid benefits in the amount of $27,145 in 2014. At year end, the plan held assets in the amount of $643,368.

109.    According to the Plan's Form 5500, by the end of 2015, the Plan had 3 participants. The Plan had income in the amount of $15,007 in 2015. The Plan also

paid benefits in the amount of $35,965 in 2015. At year end, the plan held assets in the amount of $622,330.

110.   According to the Plan's Form 5500, by the end of 2016, the Plan had 2 participants. The Plan had income in the amount of $88,608 in 2016. The Plan also paid benefits in the amount of $27,764 in 2015. At year end, the plan held assets in the amount of $683,174.

111.   According to the Plan's Form 5500, the Plan had 2 participants in 2017. The Plan had income in the amount of $54,702 in 2017. The Plan also paid benefits in the amount of $31,651 in 2017. At year end, the plan held assets in the amount of $706,225.

112.   According to the Plan's Form 5500, the Plan had 2 participants in 2018. The Plan suffered a loss of $77,308 in 2018. The Plan also paid benefits in the amount of $34,079 in 2018. At year end, the Plan held assets in the amount of $594,838.

113.   Edward B. Batal died on March 24, 2019.

114.   Between 2009 and 2018, Ed acted as the Plan administrator.

115.   In 2019, Marilyn Batal acted as the Plan administrator.

116.   Upon information and belief, Ed and/or Marilyn Batal also acted as the trustee(s) of the Plan.

117.   Upon information and belief, Ed allowed Marilyn Batal to participate in the Plan, even though she was not an employee of Batal Corp.

118.   According to the Plan's Form 5500, the Plan had 2 participants at the beginning of 2019 and zero participants at the end of 2019. The Plan had income in

20

the amount of $11,616 in 2019. The Plan also paid benefits in the amount of $16,491 in 2019.

119.   Marilyn Batal transferred the remaining $589,963 out of the Plan in 2019.

120.   Upon information and belief, Marilyn Batal transferred the remaining assets in the Plan to the estate of Edward Batal and/or the Batal Family Living Trust in order to shield those assets from Nancy, who should have been a participant in the Plan.

121.   Upon information and belief, Ed and/or Marilyn Batal breached their fiduciary duties to Plan participants, including Nancy who should have been classified as an employee and a Plan participant.

122.   Upon information and belief, Ed and/or Marilyn Batal failed to provide Plan participants, which should have included Nancy, with plan documents including summary plan descriptions, summaries of material modifications, summary annual reports, trust agreements, annual notices, and service provider disclosures.

123.   Upon information and belief, Ed and/or Marilyn Batal, and/or Batal Corp., improperly acted as trustee of the Plan and failed to treat the assets of the Plan as owned by the participants.

124.   Instead, upon information and belief, Ed and/or Marilyn Batal, and/or Batal Corp., treated the Plan as their own personal bank account, thereby ignoring all of the fiduciary and trust principles applicable to a defined contribution plan under ERISA.

125.    Defendants violated the exclusive benefit rule applicable to the Plan assets, by failing to act with undivided loyalty to the Plan, and instead acting in their own interest instead.

126.    As an employee of Batal Corp., Nancy was a participant in the Plan and should have been given the opportunity to make contributions to the Plan for the duration of her employment and receive notices from the Plan.

127.    Upon information and belief, even in years when other employees (for example, Donna Shaw) did not make contributions to their 401k, Ed would make contributions toward the Plan for employees as a bonus if the Agency had a good year.

128.    One or more of the Defendants breached their fiduciary duty to Plan participants by failing to make sound investment decisions regarding Plan assets, causing the Plan to sustain unreasonable losses.

129.    Upon information and belief, Defendants did not take proper steps under the Plan or related trust agreements to provide notice to participants in 2019, or to properly terminate or rollover the Plan assets.

## SALE OF THE AGENCY/MISAPPROPRIATION OF TRADE SECETS

130.    By early 2017, Nancy and Ed's relationship was strained. In addition to Ed's health declining, Marilyn repeatedly made false and defamatory statements to Ed about Nancy. For instance, Marilyn would tell Ed that Nancy was on vacation all the time, or that she was not working hard enough. Marilyn repeatedly urged Ed to pay Nancy less and she convinced Ed he should not sell the Agency to Nancy.

131.   During her deposition in the YCSC action, Marilyn claimed that Nancy was "not interested in insurance" and she was "not doing the job" that Ed felt she was "hired to do."

132.   Marilyn admitted at her deposition that Ed did not have "full capacity" when he was "a very sick man" toward the end of his life. She also testified that "nobody realized how sick he was except me."

133.   Marilyn testified at her deposition that Ed wished he had hired "a man" to manage the Agency instead of Nancy, because "he loved his daughter and he would rather have seen her just be a clerk in the office."

134.   Marilyn claimed at her deposition that she was never an employee of the Batal Agency, but upon information and belief she was paid by the Agency regardless of whether or to what extent she performed work.

135.   Marilyn testified at her deposition that Ed was afraid if he sold the Agency to Nancy he would not get paid.

136.   Marilyn also testified under oath that Ed was "paying too much to Nancy."

137.   Ed's attorney, Jessie Krall, testified that he had "good days" and "really bad days" in terms of capacity.

138.   On May 3, 2017, Marilyn made misrepresentations of material facts to Nancy via text message, stating as follows: "Nancy. I feel so bad that you and dad have differences [I] know he is loud and hollers and [I] get it all the time but [I] just walk away and attribute it to his sickness. Some days [i] feel he is not going to make it then

23

it turns around. It is very hard on a person. I think you two have to make amends and talk about selling the business. It is hard on both of you. Your stress shows and [I] love you like a daughter and it hurts. He is a man and they are different."

139.   This May 3, 2017 text contained false and misleading statements, including that Marilyn was contacting Nancy out of "love." In reality, Marilyn was trying to induce Nancy to "make amends" with her father by agreeing to let him sell the business to another party, despite their longstanding agreement that no one else would ever own the Batal Agency.

140.   Marilyn wanted Ed to sell the Agency to someone other than Nancy because a sale to another party would be more profitable. A sale to another party would enable Marilyn to avoid having to negotiate or confront the following issues with Nancy: (A) how much her own contributions to the company's profits should be credited against the purchase price; (B) how to determine the purchase price for the Agency when Ed had promised Nancy he would "freeze" the price at twice the profits in 2003 ($450,000, for a total of $900,000), which did not amount to a concrete price term in 2017; (C) how much Nancy should be compensated for her client list and book of insurance business, which she alone had developed since the 1990s; (D) how to handle Ed's previous promise to transfer forty percent of the stock of the Agency to Nancy, meaning her purchase price for the Agency should be discounted by forty percent; and (E) how to handle the problem of Nancy finding out the Agency had a 401k Plan with more than $600,000 in assets, in which she had not been allowed to participate.

141.   After the above text exchange in May of 2017, Nancy met with Marilyn in person and showed her the handwritten agreements between her and Ed from 2003. By mid-2017, Marilyn had knowledge of these written promises and/or contract documents. Nancy offered to provide Marilyn with a copy of the documents, but Marilyn refused to take a copy.

142.   On August 2, 2017, Marilyn texted Nancy, "Your dad has kidney failure" and: "You and [I] have to get together and talk."

143.   In August of 2017, Nancy received an anonymous letter that stated as follows: "Nancy, I am very curious about something. I have been hearing The Batal Agency is closing at the end of December this year. I have heard it from several people. I've seen who I think is Donna and an older lady in Aroma Joe's (named Marilyn was mentioned I think. Hard to hear in there) on several occasions when I go in on Saturday to get my coffee before I head off to work. I was listening when maybe I shouldn't have been but like I said I was curious. I thought I heard you were going to buy the business but still it would be closing. Neither of them had anything good to say about you or the business and would be happy when it closed. Is all this correct? Will you be sending out something so we as customers can start looking around?"

144.   In early November of 2017, Marilyn and Nancy discussed the sale of the business. Marilyn then texted Nancy: "Not sure why but [I] told your father we talked and he was ugly said you keep out of it. Nancy needs to come talk to me so therefore [I] cannot talk anymore. He made that perfectly clear by hollering at me. He said [I]

am closing that place. One day he says one thing the next something else. I am sorry for you and me."

145.   Throughout November of 2017, Nancy and Marilyn exchanged text messages about getting Nancy and Ed together to discuss the sale of the business. Marilyn told Nancy there were potential buyers for the Agency and claimed to be "in the middle" of a dispute between Ed and Nancy.

146.   Marilyn's claim that she was "in the middle" of a dispute between Ed and Nancy was false and intended to fraudulently induce inaction on Nancy's part, because Marilyn was working behind the scenes to ensure that Nancy could not purchase the Agency. Marilyn knew that Ed was either contemplating selling, had been convinced by her to sell, or was in the process of selling the Agency to another party by this time, yet she misrepresented this information to Nancy in conversations and by omission.

147.   Marilyn told Nancy that she should meet with Ed soon to discuss buying the Agency.

148.   Within a week, Nancy texted Marilyn asking for a proposed price and the terms of sale for the Agency.

149.   Marilyn said she would "look up figures for the old boy and go from there." When Nancy responded by asking what was being offered to other potential buyers for the Agency, Marilyn misled Nancy into believing there had not been a price set and "they are just in a talking stage."

150.   The same day, on November 28, 2017, Marilyn wrote the following text to Nancy: "I just talked to dad. He is feeling so much better that at this point in his

life. He is not sure he wants to sell. He is intended to continue to run the business as a sole proprietorship as he has in the past. He intends to restructure the business so he can pay the new overhead per current income Dad feels with the current expense [structure] he will be unable to maintain current expenses. Dad feels you should be looking for a new job with someone that can afford to pay your salary. These words he just quoted to me. Sorry."

151.    Nancy responded to the above text by asking if her father intended to let Donna Shaw go too. Marilyn responded: "He said he is thinking. She wants to retire anyway. He is real grumpy."

152.    Nancy responded to Marilyn: "This is ludicrous we all know he is NOT better. When would he like to meet?" Marilyn did not respond to this text.

153.    On December 12, 2017, Nancy tried to speak to her father directly. Nancy texted Marilyn recounting that she had called Ed to set up an appointment, "and he immediately became combative and called me a lazy Scottish Jew and had nothing to discuss with me but criticism." Nancy also said, "I'm open to have a civil conversation even if it requires a mediator. Whether he choses to believe it or not we are no longer in an industrial era but rather information era and people get their info from the internet. Commissions have been cut, clients buy differently. I have always put the business first and can continue to do so if treated properly. I can no longer have empty promises and keep my life on hold."

154.   In a separate text the same day, Nancy said to Marilyn: "Based on correspondence and discussions I understand my last date of employment is 12/31/17. Please confirm."

155.   Marilyn responded, "Oh Nancy. I wish [I] could understand your father. I have given up. I told him [I] was not getting involved anymore. He drives me nutty. He said you called and wanted to get together [I[ will show him your email and hope you two can talk."

156.   Marilyn also claimed via text that: "What he is saying to me is in anger. I told him to wait a few [hours] before he responds. He did say he cannot talk to you because you cry and he said he did not say those things. I was not here. Either you have to call him or [I] will repeat to you later what he says. Sorry. I hate this . . . . He said he wishes you and David a wonderful life in Fl because he said he imagines that is where you are heading."

157.   Marilyn's final text to Nancy on December 12, 2017 confirmed that Nancy was being terminated effective December 31, 2017: "He said you two cannot talk[.] He never knows where you are going or when so therefore yes the 31st is it. I can do nothing. I don't like being in the middle."

158.   Nancy left the Agency at the end of 2017 with no information to suggest that Ed was planning on selling it to another party. Instead, Nancy expected that her father would realize he (or Marilyn on his behalf) could not run the Agency and he would need her back.

159.   Alternatively, Nancy expected that Ed would pass away in the early part of 2018, during which time Ed refused to speak to her.

160.   Nancy continued to wait for her father's call through January, February, and March of 2018. Instead, she received a call from Ed's lawyer, Jessie Krall, in early April of 2018 asking her to sign a non-compete agreement to "fast track" the sale of the Agency.

161.   At the time, Nancy had been fired from the Agency and did not have a non-compete in place.

162.   During their phone conversation in early April 2018, Nancy immediately informed Attorney Krall that she had been promised the Agency would be hers, no one would ever own the Agency but her (or Ed), and/or she had a forty percent ownership share in the Agency.

163.   Nancy later emailed the handwritten promises and/or contracts between her and Ed to Attorney Krall.

164.   At the end of April 2018, Nancy received a form letter jointly sent by the Batal Agency and Curley Associates. The letter was dated April 25, 2018, and informed Nancy as a client of the Agency that the two entities were merging.

165.   In terminating Nancy's employment and selling the list of clients that Nancy had worked for more than thirty years to develop, Defendants engaged in blatant trade secret violations that they knew would be a misappropriation of Nancy's intellectual and intangible property.

166.   Along with Defendants, Timothy Curley of Curley Associates in Sanford ("Curley") knew that Nancy was the rightful owner of her entire book of business and the Agency that she worked to develop while her father was absent from the business virtually every day.

167.   The client list and proprietary information that Ed, Marilyn, and/or Batal Corp. sold to Curley belonged to Nancy, not Defendants.

168.   Alternatively, even if the entire client list, goodwill, and proprietary information connected to the Agency was not entirely owned by Nancy, she was entitled to at least forty percent of the Agency in connection with the sale.

169.   Because the Agency robbed Nancy of her entire client list and other trade secrets that she can never get back, she has been economically harmed by having her life's work and a career spanning more than thirty years destroyed.

170.   Due to Defendants' wrongful actions, including misappropriation of trade secrets, Nancy is now deprived of any ability to earn a living at her prior level. The hard work and decades of time she put in to building the Batal Agency, which she expected would be hers someday, along with all of its clients, has vanished.

171.   Upon information and belief, Ed was in negotiations with Curley to purchase the Agency as early as December 2017 or January 2018, because a draft of the closing agenda lists January 6, 2018 as the proposed closing date.

172.   In February and March of 2018, Ed, Marilyn, and/or Batal Corp. continued to negotiate the sale of the Agency to Curley, knowing all along that Nancy had a legal right to her client list and other intellectual property, a legal right to forty

percent of stock in the company, and/or the guaranteed legal right to purchase the Agency instead of Curley.

173. Meanwhile, in March of 2018, Ed and/or Marilyn hired Attorney Krall to not only steal the Agency from Nancy, but to also disinherit her from Ed's will.

174. The disinheritance was accomplished by Attorney Krall's creation of the Batal Family Living Trust, into which she assisted Defendants with the transfer of multiple pieces of real property owned by Ed and/or Marilyn.

175. Contemporaneous with negotiating the sale of the Agency to Curley instead of Nancy, on or about March 21, 2018, Defendants transferred most of the real estate owned by Ed, Marilyn, and/or the Batal Agency into the Batal Family Living Trust.

176. On or about March 21, 2018, Ed signed a new will that left Nancy out of the Batal Family Living Trust.

177. When Ed and Marilyn transferred their assets to the Batal Family Living Trust, they did so for the express purpose of shielding any assets that Nancy may be able to collect if she eventually sued them for all of the reasons stated herein, as well as the reasons set forth in the YCSC action.

178. On March 22, 2018, the very next day after Ed changed his will to disinherit Nancy, and while he was involved in fraudulently transferring all property owned by him and Marilyn into the Batal Family Living Trust, Ed and Curley came to terms on a proposed purchase and sale agreement for the Agency.

179.   Ed and Curley agreed on a proposed purchase price of $335,000 for all assets of the Agency, with the owner (Ed and Marilyn Batal) financing the transaction.

180.   The Batal Agency tried to include a non-compete in the closing documents that would prohibit Nancy from doing any insurance sales, even though she received nothing in consideration for selling the Agency, including her entire book of business, to Curley.

181.   Alternatively, Curley insisted on a non-compete with Nancy if she wanted to "hang" her license at "his" agency.

182.   On or about April 6, 2018, Ed and Marilyn Batal's attorney, Jessie Krall, called Nancy to ask if she would sign a non-compete, or if she wanted to "hang" her license at the new Curley agency.

183.   Attorney Krall discussed new language "about Nancy" in the closing documents on April 6, 2018, informing Curley and his counsel that: "Ed is not worried about making sure [Nancy] hangs her license anywhere at this point…with the new language regarding commissions and Nancy, we should be able to close this next week."

184.   Later that day, Attorney Krall emailed Curley as follows: "Tim, thank you for offering but please do not call Nancy. Ed changed his mind about contacting her and he will suffer consequences. He doesn't want to stir the pot right now."

185.   The closing of the asset purchase and sale between the Batal Agency and Curley occurred on April 13, 2018.

186.   The assets that Defendants transferred to Curley included the following:

> All business assets, equipment, furniture, photocopiers, computers, software, other electronic devices, machinery, customer lists, tradenames, telephone and fax numbers, numbers, websites, email addresses, post office boxes, and tangible personal property, including but not limited to the following: all insurance policy renewals; all customer lists of the Batal Agency; all information and records relating or pertaining to such policy renewals and customer lists, including but not limited to all Seller's files, lists, information, billing and payment histories, and records; and the name "Batal Insurance Agency" and all other names (including but not limited to domain names) used by Seller in any way in connection with the Insurance Business.

187.   In May of 2018, with the future of her career and insurance license uncertain, Nancy reached out to another agency, Spence and Mathews, to see if she could hang her license there and reach out, using Spence and Mathews letterhead, to all of the clients Defendants stole from her.

188.   Initially, Spence and Mathews agreed to let Nancy send letters to her former clients on their letterhead, but said they needed to check with legal counsel.

189.   In July of 2018, Spence and Mathews informed Nancy that the company did not feel comfortable hiring her or allow marketing of her client list on Spence and Mathews' letterhead, out of fear that Curley would sue the agency.

**FRAUD AND FRAUDULENT TRANSFERS**

190.   The sale of the Agency from Ed to Curley was itself a fraudulent transfer that is avoidable as to both Defendants and Curley, because Curley was aware of the claim that Nancy had against Defendants as described herein.

191.   Ed, Nancy, and/or the Batal Family Living Trust engaged in the following fraudulent transfers initiated in March of 2018 prior to finalizing the sale of the Agency, for the sole purpose of defrauding Nancy and shielding assets from her.

As of March 2018, Nancy was a known creditor with a claim against Defendants for all of the reasons discussed herein. Defendants knew that Nancy was about to find out the Agency she had been promised, her entire client list, and other goodwill and intangible/intellectual property was about to vanish as part of the sale of the Agency to Curley. As a result, Defendants moved quickly to fraudulent transfer assets as the sale of the Agency was being finalized. The fraudulent transfers including at least the following:

A. **392 Hanson's Ridge Road, Springvale, Maine**: On or about March 21, 2018, by and through his counsel Jessie Krall, Ed conveyed his primary residence located at 392 Hanson's Ridge Road in Springvale to Edward B. Batal, Sr. and Marilyn L. Batal, as trustees of the Batal Family Living Trust. The current assessed value of this property is $374,800. Upon information and belief, no value was paid in exchange for this transfer.

B. **1580 Main Street, Sanford, Maine**: On or about April 6, 2018, by and through his counsel Jessie Krall, Ed conveyed this property to Edward B. Batal, Sr. and Marilyn L. Batal, as trustees of the Batal Family Living Trust. The current assessed value of this property is $151,400. Upon information and belief, no value was paid in exchange for this transfer.

C. **985 Main Street, Sanford, Maine**: On April 6, 2018, Ed, by and through his counsel Jessie Krall, conveyed this property to Edward B. Batal, Sr. and Marilyn L. Batal, trustees of the Batal Family Living

Trust. Upon information and belief, no value was paid in exchange for this transfer.

D.    After an attachment entered in the YCSC action was vacated, as discussed below, the Batal Family Living Trust conveyed the property located at 985 Main Street in Sanford to RBBJM Realty Trust for a purchase price of $75,000 on or about October 7, 2020. The current assessed value of this property is $144,700.

E.    **987 Main Street, Sanford, Maine**: On April 6, 2018, Ed and Marilyn, by and through their counsel Jessie Krall, conveyed this property to Edward B. Batal, Sr. and Marilyn L. Batal, as trustees of the Batal Family Living Trust. The current assessed value of this property is $128,100. Upon information and belief, no value was paid in exchange for this transfer.

F.    After an attachment entered in the YCSC action was vacated, as discussed below, the Batal Family Living Trust conveyed the property located at 987 Main Street in Sanford to RBBJM Realty Trust for a purchase price of $175,000 on or about October 7, 2020.

G.    **1 Park Street, Sanford, Maine**: On April 6, 2018, Ed and Marilyn, by and through their counsel Jessie Krall, conveyed this property to Edward B. Batal, Sr. and Marilyn L. Batal, as trustees of the Batal Family Living Trust. Upon information and belief, no value was paid in exchange for this transfer.

H.    After an attachment entered in the YCSC action was vacated, as discussed below, the Batal Family Living Trust conveyed the property located at 1 Park Street in Sanford to RBBJM Realty Trust for a purchase price of $75,000 on or about October 7, 2020

I.    **952 Post Road, Unit 8, Wells, Maine**: On or about October 15, 2020, Marilyn Batal, as Personal Representative of Ed's estate, sold a condominium located at 952 Post Road, Unit 8, in Wells, Maine to Lion Holdings, LLC for a purchase price of $90,000.

J.    **Weymouth Street, Sanford, Maine**: On or about February 21, 2019, Ed conveyed by and through his counsel, Jessie Krall, an undivided one-half interest in the property he jointly owned with Nancy's husband, David Sholler.

192.    Plaintiff filed suit against her father in the YCSC on July 20, 2018, alleging breach of contract, unjust enrichment, and quantum meruit.

193.    On or about July 23, 2018, Plaintiff—by and through previous counsel in the YCSC action—obtained an *ex parte* order of attachment and trustee process against the assets, property, goods, and credits belonging to Ed, in the amount of $500,000.

194.    The order of attachment encumbered five parcels of real estate that Defendants had previously transferred to the Batal Family Living Trust, as described above. Those properties included 392 Hanson's Ridge Road in Springvale; 1580 Main

Street in Sanford; 985 Main Street in Sanford; 987 Main Street in Sanford; and 1 Park Street in Sanford.

195.    The total value of the foregoing real property that had been fraudulent placed into the Batal Family Living Trust exceeded the $500,000 attachment granted by the YCSC. Therefore, by and through his counsel Jessie Krall, Ed filed a motion on August 13, 2018 with the YCSC to have the attachment modified so that only the properties located at 392 Hanson's Ridge Road in Springvale, 1580 Main Street in Sanford, and 985 Main Street in Sanford would be subject to the attachment. The YCSC granted that motion and limited the attachment as requested.

196.    Attorney Krall testified in the YCSC action that she met Ed in December of 2017, and by that time he was not doing well. Ed had good days and really bad days; on the bad days, he was confused.

197.    Attorney Krall also testified that by December of 2017, Ed had already negotiated the terms of the sale of the Agency to Curley.

198.    As discovery progressed in the YCSC action, Nancy produced documents by and through her attorney, including the First and Second Batal Writing described above. After she met with Ed in April of 2003, Nancy wrote "freeze price at $900,000" in the top corner of the First Batal Writing.

199.    Upon information and belief, and without waiving the attorney client privilege between Nancy and her prior counsel, Nancy told her prior counsel that she could not remember when she wrote the "freeze price at $900,000" note on the First

Batal Writing, but she thought she wrote it on a copy, not the original, and she wrote the note after meeting with Ed.

200.   Based on the foregoing, and because the "freeze price at $900,000" note that Nancy wrote was not part of the original agreement between the parties, Nancy's prior counsel redacted her handwritten note on the document in filing the original YCSC complaint and motion for *ex parte* attachment.

201.   Nancy's handwritten note on the First Batal Writing was inadmissible under the parol evidence rule because it was written after the fact, and not part of the agreement between the parties. Even if Nancy's "freeze price at $900,000" note on the First Batal Writing were admissible in the YCSC action, it would be entirely irrelevant because it merely reiterates what appears in the First Batal Writing itself, where Ed wrote: "Freeze the value of the Batal Agency at 2 times the 2002 income level."

202.   Nancy included her handwritten note on the First Batal Writing in preparation for litigation, and therefore it was not admissible under M.R. Civ. P. 26(b)(5) during the YCSC action.

203.   By the time of Nancy's deposition, her prior counsel had produced the unredacted First Batal Writing to Ed's counsel in the YCSC action, Greg McCullough.

204.   Nonetheless, Attorney McCullough filed a motion to vacate the attachment that was entered (and amended) in the YCSC action, arguing without merit that the July 28, 2018 *ex parte* order of attachment had been procured by Plaintiff "committing a fraud on the court."

205.   Attorney McCullough has made other absurd and incredible accusations in the YCSC action, including that the "crime-fraud" exception to the attorney client privilege entitles him to take the deposition of Nancy's prior counsel. Attorney McCullough's incredible accusations included a letter from his client, Marilyn Batal, falsely accusing the sitting YCSC justice of bias. Recently, the Superior Court justice assigned to the YCSC action recused himself as a result of Attorney McCullough's incredible accusations.

206.   Following Attorney McCullough's absurd and incredible allegations in the YCSC action, the Court vacated the attachment that had been modified in August of 2018 to attach the three parcels of real property described above, for a total value of over $500,000.

207.   Attorney McCullough filed a Notice of Order Vacating Attachment in the York County Registry of Deeds on or about June 3, 2020.

208.   After the attachment was vacated, Attorney McCullough and/or Attorney Krall assisted Defendants with the fraudulent transfers described above. Attorney McCullough and Attorney Krall are both witnesses to the fraudulent transfers alleged herein. The fraudulent transfers of property belonging to the Batal Family Living Trust drained the trust of significant assets held by Defendants.

## COUNT I – Civil RICO Act, 18 U.S.C. § 1962(a)
### (All Defendants)

209.   Plaintiff repeats and realleges the facts stated in Paragraphs 1 through 208 as if fully set forth herein.

39

210.    Defendant Marilyn Batal, individually and as the Personal Representative of the Estate of her late husband Ed, along with Batal Corp. and the Batal Family Living Trust, collectively engaged in or formed an enterprise, as defined under the Federal RICO Act, which constituted an association in fact.

211.    Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who participated, directly or indirectly, in the affairs of the enterprise designed specifically to defraud Nancy of her clients, profits, wages, retirement, inheritance, property, and the Agency itself.

212.    Defendants received income derived, directly or indirectly, from a pattern of racketeering activity, and then used or invested, directly or indirectly, such income or the proceeds of such income, to acquire an interest in, operation of, or establishment of, an enterprise that was engaged in racketeering activities that affected interstate commerce.

213.    Defendants' racketeering activity affected interstate commerce.

214.    Defendants engaged in two or more predicate acts under the RICO Act, including but not limited to the following: 18 U.S.C. § 664: Embezzlement from pension and welfare funds; 18 U.S.C. § 1341: Mail fraud; 18 U.S.C. § 1343: Wire fraud; 18 U.S.C. § 1344: Financial institution fraud; 18 U.S.C. § 1954: Unlawful welfare fund payments; 18 USC § 1956: Money laundering; 18 U.S.C. §§ 1831 and 1832: Theft of trade secrets and economic espionage.

215.    Each of the aforementioned predicate RICO acts posed a threat of ongoing criminal activity under Federal law.

216. The Batal Corp. and/or the Batal Family Living Trust was a separate and distinct entity that participated with Ed and/or Marilyn Batal to accomplish the racketeering activity described herein.

217. Plaintiff suffered a financial and/or investment injury as a result of the racketeering activity described herein. Plaintiff was injured in her business or property as a result of the racketeering described herein.

218. There is a threat of ongoing racketeering activity by Defendants.

219. Because of Defendants' RICO violations, Plaintiff is entitled to treble damages and attorney's fees under 18 U.S.C. § 1964.

220. RICO § 1964(a) also authorizes the Court to "prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders, including, but not limited to: ordering any person to divest himself of any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments of any person, including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce; or ordering dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons."

221. Based on the above, Plaintiff seeks an "appropriate order" disgorging the real estate, retirement plan income, retained wages, and all other profits illegally gained by Defendants, as well as disgorgement or forfeiture of any proceeds of their fraud.

WHEREFORE, Plaintiff Nancy Batal-Sholler requests that the Court enter judgment in her favor and against Defendants on her Civil RICO claim, award monetary damages, treble damages, disgorgement of profits, attorney's fees and costs of suit, plus interest, and such other and further relief as this Court deems just and appropriate.

## COUNT II – Civil RICO Act, 18 U.S.C. § 1962(b)
### (All Defendants)

222.    Plaintiff repeats and realleges the facts stated in Paragraphs 1 through 221 as if fully set forth herein.

223.    For all of the reasons set forth in Count I above, Defendants engaged in a violation of the Federal RICO Act.

224.    Defendant Marilyn Batal, individually and as personal representative of the estate of Ed, through a pattern of racketeering activity, acquired or maintained, directly or indirectly, an interest in or control of Batal Corp. and/or the Batal Family Living Trust, which was engaged in, or the activities of which affected, interstate commerce.

225.    As a direct and proximate result of Defendants' violation of 18 U.S.C. § 1962(b), Plaintiff has been and continues to be damaged and injured in her business and/or property.

WHEREFORE, Plaintiff Nancy Batal-Sholler requests that the Court enter judgment in her favor and against Defendants on her Civil RICO claim, award monetary damages, treble damages, disgorgement of profits, attorney's fees and costs

of suit, plus interest, and such other and further relief as this Court deems just and appropriate.

## COUNT III – Civil RICO Act, 18 U.S.C. § 1962(c)
### (All Defendants)

226.   Plaintiff repeats and realleges the facts stated in Paragraphs 1 through 225 as if fully set forth herein.

227.   One or more of the Defendants, who were either employed by or associated with the enterprise described in Counts I and II above, conducted or participated in, either directly or indirectly, activities affecting interstate commerce, in connection with the affairs of the enterprise described herein, through a pattern of racketeering activity.

228.   As a direct and proximate result of Defendants' violation of 18 U.S.C. § 1962(c), Plaintiff has been and continues to be damaged and injured in her business and/or property.

WHEREFORE, Plaintiff Nancy Batal-Sholler requests that the Court enter judgment in her favor and against Defendants on her Civil RICO claim, award monetary damages, treble damages, disgorgement of profits, attorney's fees and costs of suit, plus interest, and such other and further relief as this Court deems just and appropriate.

## COUNT IV – Civil RICO Act, 18 U.S.C. § 1962(d)
### (All Defendants)

229.   Plaintiff repeats and realleges the facts stated in Paragraphs 1 through 228 as if fully set forth herein.

230.    For all of the reasons set forth in Counts I through III above, Defendants unlawfully conspired to violate the provisions of 18 U.S.C. § 1962(c).

231.    Each of the Defendants actually participated in the conspiracy to defraud Nancy as alleged herein.

232.    As a direct and proximate result of Defendants' violation of 18 U.S.C. § 1962(d), Plaintiff has been and continues to be damaged and injured in her business and/or property.

WHEREFORE, Plaintiff Nancy Batal-Sholler requests that the Court enter judgment in her favor and against Defendants on her Civil RICO claim, award monetary damages, treble damages, disgorgement of profits, attorney's fees and costs of suit, plus interest, and such other and further relief as this Court deems just and appropriate.

## COUNT V – ERISA § 510 INTERFERENCE
### (29 U.S.C. § 1140)
### (Batal Corp. and Marilyn Batal)

233. Plaintiff repeats the allegations contained in Paragraphs 1 through 232 as if fully stated herein.

234. ERISA § 510 provides that: "It shall be unlawful for any person" to "discriminate against a participant or beneficiary . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, this title, or the Welfare and Pension Plans Disclosure Act."

235. The Plan discussed above was an employee benefit plan within the meaning of ERISA.

236. Because she was legally an employee of the Agency, as set forth above, Nancy was a "participant" of the Plan within the meaning of ERISA section 510.

237. Nancy was entitled to benefits under the Plan and she met all requirements for participation under the Plan.

238. Defendants interfered with Nancy's ability to collect benefits under the Plan in the same manner as other employees of the Agency were allowed to participate in and contribute to the Plan.

239. Defendant Batal Corp., by and through its sole shareholder and agent Ed Batal and/or his wife Marilyn, interfered with Nancy's rights under ERISA and prohibited her from obtaining employer contributions to the Plan, which other employees received.

240. After Nancy realized that she should have been classified as an employee of the Agency, and changed her designation as such, the Agency fired her with the specific intent to deprive her of benefits under the Plan, as well as other employee benefits to which she was entitled.

241. Defendants' discriminatory treatment of Nancy and misclassification of her employment status was undertaken with the specific intent to deprive her of employee benefits under the Plan.

242. Defendants' discriminatory treatment of Nancy and misclassification of her employment status was undertaken with the specific intent to deprive her of retirement benefits and employer contributions.

243. Defendants' desire to interfere with Nancy's right to participate in the Plan was a motivating factor behind her misclassification as an independent contractor and/or her ultimate termination from employment.

244. Because this is a statutory claim, the terms of the Plan do not require administrative exhaustion.

245. Alternatively, any administrative exhaustion requirement that existed does not apply in this case because an appeal would have been futile.

WHEREFORE, Plaintiff Nancy Batal-Sholler requests that the Court enter judgment in her favor and against Defendants and award her all equitable, statutory, and compensatory damages available under ERISA § 510, along with attorney's fees, costs and expenses, and all other relief afforded by law.

## COUNT VI – ERISA § 502(a)(1)(B) CLAIM FOR BENEFITS
### (29 U.S.C. § 1132(a)(1)(B))
### (Defendants Batal Corp. and the
### Edward B. Batal Defined Contribution Plan)

246. Plaintiff repeats the allegations contained in Paragraphs 1 through 245 as if fully stated herein.

247. Under ERISA § 502(a)(1)(B), an action may be brought "to recover benefits due" to a plan participant, to enforce her rights under the plan, or to clarify her rights to future benefits under the terms of the plan.

248. Because the Agency fraudulently misclassified Nancy's employment in order to deprive her of benefits due under the Plan, Nancy was never given adequate notice of the terms of the Plan, her right to seek benefits under the Plan, or the fact that she was denied benefits under the Plan.

46

249. Under the terms of the Plan and various State and Federal laws that govern whether an individual is an employee or an independent contractor, Plaintiff was an employee of Batal Corp.

250. Upon information and belief, Plaintiff met all participation requirements contained in the Plan.

251. Upon information and belief, Plaintiff was eligible for benefits under the terms of the Plan itself.

252. If Plaintiff had been properly classified as an employee of Batal Corp., she would have participated in the Plan by contributing the maximum amount allowed each year, which the Agency would have matched.

253. Plaintiff seeks benefits due to her under the Plan, along with attorney's fees, costs, and all other relief allowed under ERISA § 502(a)(1)(B).

254. Administrative exhaustion of Nancy's ERISA claim for benefits would have been futile and was not necessary under the circumstances of this case.

255. Administrative exhaustion of Nancy's ERISA claim for benefits was not necessary because Nancy was denied meaningful access to plan documents and procedures.

256. Administrative exhaustion of Nancy's ERISA claim for benefits was not required because Nancy would suffer irreparable harm if Defendants were allowed to profit from their fraudulent conduct toward Nancy. Instead, Defendants should be equitably estopped from arguing that Nancy has failed to exhaust administrative remedies under the terms of the Plan.

WHEREFORE, Plaintiff Nancy Batal-Sholler requests that the Court enter judgment in her favor and against Defendants and award her all equitable and statutory damages available under ERISA § 502, along with attorney's fees, costs and expenses, and all other relief afforded by law.

### COUNT VII – ERISA § 502(a)(2) BREACH OF FIDUCIARY DUTY
**(Defendants Batal Corp. and Marilyn Batal, individually and as Personal Representative)**

257. Plaintiff repeats the allegations contained in Paragraphs 1 through 256 as if fully stated herein.

258. Nancy was a Plan participant and/or beneficiary because she was an employee of the Agency.

259. As fiduciaries of the Plan who exercised discretion over the management of fund assets, or administered the Plan itself, Ed and/or Marilyn breached their responsibilities, obligations, and duties to the Plan. The Plan sustained significant losses due to unsound investment decisions and mismanagement by Defendants.

260. Under ERISA, Ed and/or Marilyn are personally liable to make good to the Plan any losses sustained as a result of their breach of fiduciary duty, including mismanagement of Plan funds and investments, and intentional misclassification of Nancy's employment status.

261. Marilyn, in her individual capacity as well as her capacity as the personal representative of Ed's estate, is personally liable to restore to the Plan any profits made through use of Plan assets, along with such other equitable or remedial relief that the Court may deem appropriate.

262. Nancy brings this breach of fiduciary duty claim on behalf of the Plan as a whole to redress injuries to the Plan resulting from Ed and Marilyn's breach of fiduciary duty.

263. Plaintiff brings this breach of fiduciary duty claim to obtain appropriate equitable belief to redress Defendants' violation of the Plan and enforce any and all applicable provisions of the Plan and ERISA.

WHEREFORE, Plaintiff Nancy Batal-Sholler requests that the Court enter judgment in her favor and against Defendants and award her all equitable and statutory damages available under ERISA § 502, along with attorney's fees, costs and expenses, and all other relief afforded by law.

## COUNT VIII – ERISA § 502(a)(3) EQUITABLE RELIEF
### (29 U.S.C. § 1132(a)(1)(B)(3))
### (Defendants Batal Corp., Marilyn Batal, and the
### Edward B. Batal Defined Contribution Plan)

264. Plaintiff repeats the allegations contained in Paragraphs 1 through 263 as if fully stated herein.

265. To the extent not already addressed by Counts V, VI, and VII above, Plaintiff brings an ERISA § 502(a)(3) claim for equitable relief to remedy the statutory violations and breach of fiduciary duties described herein.

266. Disgorgement of profits is a remedy specifically available under the catcall provisions of ERISA § 502(a)(3).

267. In addition to disgorgement of profits, Plaintiff seeks equitable relief estopping Defendants from arguing that she was not entitled to benefits under the terms of the Plan because she did not become an employee of the Agency until 2017.

Equitable estoppel and other equitable relief is appropriate under the circumstances of this case because of the fraud described herein.

WHEREFORE, Plaintiff Nancy Batal-Sholler requests that the Court enter judgment in her favor and against Defendants and award her all equitable and statutory damages available under ERISA § 502(a)(3), along with attorney's fees, costs and expenses, and all other relief afforded by law.

### COUNT IX – FRAUD
### (Defendants Marilyn Batal, individually and as PR,
### Batal Corp., and Batal Family Living Trust)

268.   Plaintiff repeats the allegations contained in Paragraphs 1 through 267 as if fully stated herein.

269.   Ed fraudulently induced Nancy to work for Agency for thirty years while he performed little to no work for the Agency, while promising her that the Agency would be hers and only hers one day, knowing all along that he had no intention of selling the Agency to Nancy.

270.   Alternatively, Marilyn exercised undue influence over Ed and aided and abetted him in defrauding Nancy. Marilyn convinced Ed not to sell the Agency to Nancy even though he had promised for more than thirty years to do so.

271.   One or more of the Defendants made fraudulent misrepresentations of material facts to Plaintiff, which they knew to be false, about the intent to sell the Agency to Nancy and/or transfer 40% of the stock in the Agency to her.

272.   Defendants' fraudulent misrepresentations induced Nancy to continue working for the Agency, to refrain from taking her client list elsewhere, to refrain from

demanding an accounting or other information regarding the transfer of stock to her, and to take other related action in furtherance of the Agency's ongoing success and building her customer list.

273.   Nancy justifiably relied on Defendants' fraudulent misrepresentations to her detriment.

274.   Defendants' engaged in the aforementioned fraudulent conduct knowingly and intentionally, under circumstances that suggest actual or implied malice, justifying an award of punitive damages.

275.   Nancy has suffered extensive harm and economic loss as a result of the fraud described herein.

WHEREFORE, Plaintiff Nancy Batal-Sholler requests that the Court award her damages for Defendants' fraud, along with punitive damages, attorney's fees, costs and expenses, interest, equitable and injunctive relief, and all other relief afforded to her by law.

### COUNT X – NEGLIGENT MISREPRESENTATION
**(Defendants Marilyn Batal, individually and as PR,
Batal Corp., and Batal Family Living Trust)**

276.   Plaintiff repeats the allegations contained in Paragraphs 1 through 275 as if fully stated herein.

277.   If the allegations set forth in Count IX above do not constitute outright fraud, then in the alternative they amount to negligent misrepresentation for the following reasons.

278.   Defendants Ed and Marilyn Batal, as well as Batal Corp. and the Batal Family Living Trust, all had a pecuniary interest in the course of their business, profession, or employment, regarding the ownership, operation, and/or sale of the Batal Agency between 2017 and 2019.

279.   Defendants supplied false information for the guidance of Plaintiff in her business transactions, subjecting Defendants to liability for Nancy's pecuniary losses caused by her justifiable reliance upon information provided by Defendants, especially Ed and Marilyn Batal.

280.   Defendants failed to exercise reasonable care or competence in communicating information to Nancy about the ownership, operation, and/or sale of the Batal Agency.

281.   Defendants' conduct in miscommunicating information to Nancy about the ownership, operation and/or sale of the Batal Agency was objectively unreasonable.

282.   Nancy suffered pecuniary loss and is entitled to damages for Defendants' negligent misrepresentations.

WHEREFORE, Plaintiff Nancy Batal-Sholler requests that the Court award her damages for Defendants' negligent misrepresentation, along with punitive damages, attorney's fees, costs and expenses, interest, equitable and injunctive relief, and all other relief afforded to her by law.

## COUNT XI – VIOLATION OF THE MAINE UNIFORM
## FRAUDULENT TRANSFER ACT
### (14 M.R.S. § 3579(2))
### (Defendants Marilyn Batal, Individually and as PR, and
### The Batal Family Living Trust)

283.   Plaintiff repeats the allegations contained in Paragraphs 1 through 282 as if fully stated herein.

284.   As early as January of 2018, Defendants knew that Plaintiff was a creditor who would likely assert claims against Ed, the Batal Corp., and/or Marilyn, making Plaintiff a creditor of Defnedants' within the meaning of the Maine Uniform Fraudulent Transfer Act ("UFTA").

285.   Defendants are, and since January of 2018 knew they were, debtors of Nancy's within the meaning of the UFTA.

286.   In order to shield assets from Nancy's reach in future litigation over sale of the Agency to a third party, and all other legal disputes referenced herein, Defendants fraudulently transferred the Agency itself as well as property owned by Defendants, making Defendants transferees within the meaning of 14 M.R.S. § 3579(2).

287.   Defendants' transfers of real property to the Batal Family Living Trust, and in fact the sale of the Agency itself, are all voidable transactions within the meaning of the UFTA. The transfers of real estate described above were fraudulent, because they were to an insider, the debtor retained possession and control of the assets, Defendants knew that litigation was likely based on the events described above, the transfers represented a substantial amount of Defendants' assets, no value

or consideration was given for the transfers of real estate into the Batal Family Living Trust, and the intent of the transfers was to hide or conceal assets from Nancy.

288.  The transfers of real estate when the Batal Family Living Trust sold assets were also fraudulent for all of the same reasons outlined above. Even though such transfers were not to insiders, and value was given for the transfers, Defendants' intent was still to shield assets from Nancy.

289.  All of the fraudulent transfers described herein were made with the actual intent to hinder, delay or defraud Nancy.

290.  Plaintiff seeks all remedies available to her under the Maine UFTA, including without limitation avoidance of the transfers to the extent necessary to satisfy Nancy's claim, attachment and trustee process against the asset transferred or other property of the transferees, an injunction against further disposition of property by the debtor or a transferee, or both, and damages amounting to double the value of the property transferred or concealed.

WHEREFORE, Plaintiff Nancy-Batal Sholler seeks all damages to which she is entitled under the Maine Uniform Fraudulent Transfer Act, including a monetary judgment against transferee Defendants and such other and further relief as this Court deems just and appropriate.

### COUNT XII: TORTIOUS INTERFERENCE WITH EXPECTANCY OF INHERITANCE
**(Defendants Marilyn Batal and the Batal Family Living Trust)**

291.  Plaintiff repeats the allegations contained in Paragraphs 1 through 290 as if fully stated herein.

292.    Nancy had a reasonable and valid expectation that she would inherit under Ed's will, which included assets worth well over $1 million. In addition to the properties described above, Ed owed real estate in South Carolina and also Costa Rica.

293.    Defendants engaged in intentional interference of Nancy's expectancy of inheritance by conduct that amounted to fraud, duress, and/or undue influence.

294.    Marilyn was extremely jealous of Nancy and her relationship with Ed. For years, Marilyn filled Ed's head with lies about Nancy on a regular basis. Once Ed became sick, Marilyn's fraudulent misrepresentations about Nancy increased in severity.

295.    Marilyn had an employee of the Agency spy on Nancy so she could convince Ed that Nancy was lazy, she was not doing any work for the Agency, and she did not want to buy the business from Ed.

296.    Ed changed his will in 2018 at or around the same time that he executed the Batal Family Living Trust. Each of these actions were the direct result of Marilyn's fraud and undue influence over Ed, as she convinced him to disinherit Nancy.

297.    Ed's will change came at or around the same time that Nancy refused to sign an agreement saying that she would not compete with the buyer of the Batal Agency.

298.    Prior to Ed's will change, Nancy would have inherited in equal shares along with her siblings and Marilyn. After the Batal Family Living Trust was executed, Ed left the share of his estate that should have gone to Nancy to Marilyn's two daughters (Ed's stepdaughters).

299.   Nancy's expectancy of inheritance would have been realized, but for Marilyn's fraud, intentional interference, and undue influence.

300.   Marilyn exploited Ed's trust and used her confidential relationship with him to induce fear in Ed that the Agency he started many years ago would falter if he left it to Nancy. Marilyn then exploited Ed's trust and her confidential relationship with him to convince Ed that Nancy should be disinherited from his will.

301.   Marilyn took the above actions to interfere with Nancy's inheritance knowing that Ed was suffering from severe health problems that caused him diminished mental capacity toward the end of his life.

302.   A presumption of undue influence exists in this case due to the confidential relationship between Ed and Marilyn.

303.   Marilyn cannot prove fairness on her part or that the changes to Ed's will, and the creation of the Batal Family Living Trust, were free from undue influence.

304.  Nancy has suffered significant economic damage resulting from Marilyn's intentional and tortious interference with her expectancy of inheritance.

305.   Marilyn's intentional interference with Nancy's expectancy was motivated by ill will toward Nancy or was so outrageous that malice toward her can be implied, justifying an award of punitive damages.

WHEREFORE, Plaintiff Nancy-Batal Sholler seeks all damages to which she is entitled for Defendants' intentional interference with her expectancy of inheritance,

including monetary, compensatory, and punitive damages, along with and such other and further relief as this Court deems just and appropriate.

## COUNT XIII: TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
### (Defendant Marilyn Batal)

306.   Plaintiff repeats the allegations contained in Paragraphs 1 through 305 as if fully stated herein.

307.    For all of the reasons set forth above, Marilyn tortiously interfered with Ed's desire to sell the Agency to his daughter toward the end of his life.

308.   Marilyn repeatedly insisted that Ed could not sell the Agency to Nancy, despite his many promises to do so, because she wanted to profit from Nancy's hard work without having to give up any of the money that Nancy was making for the Agency.

309.   Marilyn knew that Ed had promised, in writing, to sell the Agency to Nancy, and Nancy's continued employment at the Agency was induced by Ed's promises.

310.   A prospective economic advantage and/or valid and binding contract to sell the Agency existed, and Marilyn knew about it. Marilyn also knew that Ed had previously agreed to transfer 40% of the stock in the Agency to Nancy, but Marilyn fraudulently induced Ed to renege on that promise.

311.   Marilyn intentionally interfered with the contract and/or economic advantage that Nancy stood to gain as a reward for years of hard work at the Agency. Nancy worked long, hard hours and developed business for the Agency while Ed and

Marilyn reaped the rewards. Marilyn then convinced Ed not to sell the Agency to Nancy.

312. Nancy has suffered significant economic damage resulting from Marilyn's intentional and tortious interference with her prospective economic advantage.

313. Marilyn's intentional interference with Nancy's prospective economic advantage was motivated by ill will toward Nancy or was so outrageous that malice toward her can be implied, justifying an award of punitive damages.

WHEREFORE, Plaintiff Nancy-Batal Sholler seeks all damages to which she is entitled for Defendants' intentional interference with her prospective economic advantage, including monetary, compensatory, and punitive damages, along with and such other and further relief as this Court deems just and appropriate.

## COUNT XIV – UNPAID OVERTIME
### (26 M.R.S. § 664)
### (Defendant Batal Corp.)

314. Plaintiff repeats the allegations contained in Paragraphs 1 through 313 as if fully stated herein.

315. For all of the reasons set forth above, Batal Corp. purposefully misclassified Nancy as an independent contractor rather than an employee of the Agency out of a greedy desire to pay her less money in the form of overtime, vacation pay, and other employee benefits.

316. Batal Corp. violated the Maine Minimum Wage Law and Plaintiff is entitled to unpaid overtime dating back six years from the filing of this Complaint, as

well as an additional amount as liquidated damages, plus costs of suit and attorney's fees.

WHEREFORE, Plaintiff Nancy Batal-Sholler requests that the Court enter judgment in her favor and against Defendant Batal Corp. and award her damages in the form of unpaid overtime, liquidated damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

### COUNT XV – UNPAID MINIMUM WAGES UNDER MAINE'S MINIMUM WAGE LAW
### (26 M.R.S. § 664)
### (Defendant Batal Corp.)

317.    Plaintiff repeats the allegations contained in Paragraphs 1 through 316 as if fully stated herein.

318.    Because Plaintiff was misclassified as an independent contractor instead of an employee, Defendant failed to pay her minimum wage for all hours worked.

319.    Plaintiff is therefore entitled to unpaid minimum wages dating back six years from the filing of this Complaint, as well as an additional amount as liquidated damages, plus costs of suit and attorney's fees.

WHEREFORE, Plaintiff Nancy Batal-Sholler requests that the Court enter judgment in her favor and against Defendant Batal Corp. and award her damages in the form of unpaid minimum wages, liquidated damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

## COUNT XVI – MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF THE MAINE UNIFORM TRADE SECRETS ACT
### (10 M.R.S. § 1541 *et seq.*)
### (Defendant Batal Corp.)

320.    Plaintiff repeats the allegations contained in Paragraphs 1 through 319 as if fully stated herein.

321.    Plaintiff has alleged above that Defendant misclassified her as an independent contractor when she should have been an employee. In the alternative, if Plaintiff was an independent contractor then all of the clients she serviced at the Agency, her entire customer list, and the goodwill of the business she developed belonged to her.

322.    Even if Plaintiff was an employee of the Batal Agency, the clientele she developed was a "trade secret" that belonged to her, which she should have been free to market and serve following the sale of the Batal Agency.

323.    Regardless of Plaintiff's status as an employee or independent contractor of the Agency, Defendant acquired her customer list and all assets of the Agency that Nancy worked for thirty years to develop, by fraud, theft, and/or breach of fiduciary duty.

324.    Batal Corp. acquired Nancy's customer list and all other trade secrets developed by her over thirty years, with the promise that the Agency would be hers and only hers one day, by improper means.

325.    Batal Corp. disclosed Nancy's entire customer list and all other trade secrets that she worked for thirty years to develop without her consent to a third party

that knew or had reason to know that Nancy's trade secrets had been misappropriated or obtained by improper means.

326.   At the time Batal Corp. misappropriated and sold Nancy's trade secrets right out from under her, the company owed Nancy a duty to maintain the secrecy of Nancy's entire customer list and all related trade secrets and limit its use by third parties.

327.   For all of the foregoing reasons, a violation of the Maine Uniform Trade Secrets Act has occurred.

328.   Nancy has suffered economic and other harm as a result of Defendant's violation of the Maine Uniform Trade Secrets Act.

329.   Defendant's misappropriation of Nancy's trade secrets was willful and malicious, justifying an award of exemplary damages.

WHEREFORE, Plaintiff Nancy Batal-Sholler requests that the Court enter judgment in her favor and against Defendant Batal Corp. and award her damages for Defendant's violation of the Uniform Trade Secrets Act, along with exemplary damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

## **JURY TRIAL DEMAND**

Plaintiff Nancy Batal-Sholler hereby demands a jury trial on all matters so triable under the laws and Constitution of the United States and the State of Maine.

Dated:  December 31, 2021          */s/ Laura H. White*

                                   _____
                                   Laura H. White, Esq. (Bar No. 4025)
                                   *Attorney for Plaintiff*
                                   WHITE & QUINLAN, LLC
                                   62 Portland Rd., Suite 21
                                   Kennebunk, ME 04043
                                   (207) 502-7484
                                   *lwhite@whiteandquinlan.com*


                                   */s/ Danielle Quinlan*

                                   _____
                                   Danielle Quinlan, Esq.
                                   *Attorney for Plaintiff*
                                   WHITE & QUINLAN, LLC
                                   62 Portland Rd., Suite 21
                                   Kennebunk, ME 04043
                                   (207) 502-7484
                                   *dquinlan@whiteandquinlan.com*