## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| NANCY BATAL-SHOLLER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Docket No. 2:21-cv-00376-NT |
| | ) |
| MARILYN BATAL, et al., | ) |
| | ) |
| Defendants. | ) |

## ORDER ON DEFENDANTS' MOTIONS TO DISMISS

Before me are three motions by the Defendants to dismiss the Complaint. For the reasons stated below, the motions are **GRANTED IN PART** and **DENIED IN PART**.

## FACTUAL BACKGROUND

Edward B. Batal, Sr., founded an insurance agency in Sanford, Maine, in the 1960s, Batal Corp. (the "**Agency**"). Compl. ¶ 17 (ECF No. 1). In 1983, Ed[1] asked his daughter, Nancy Batal-Sholler, the Plaintiff, to move back to Maine and help out with the Agency. Compl. ¶¶ 16, 19. In conjunction with this request, Ed promised Nancy that he would retire around the age of sixty-two and that she would then take over the business. Compl. ¶ 20.

Beginning in the early 1990s, Ed began traveling a lot and left Nancy in charge to run the Agency and develop business. Compl. ¶ 25. Nancy became the only

---

[1]      Because several individuals involved in this case share the same last name, I refer to them by their first names to avoid confusion.

significant producer of business and the only person performing substantive work for the Agency. Compl. ¶ 26. But Ed continued to handle the Agency's bookkeeping and finances, and he refused to let Nancy exercise financial control over the Agency. Compl. ¶¶ 63–65.

In late 2002, in preparation for Ed's upcoming sixty-second birthday the following year, Ed and/or Nancy prepared a letter for their clients letting them know that Nancy was going to be taking over the Agency. Compl. ¶¶ 28–29. But, in April 2003, Ed told Nancy that he had changed his mind about retiring and that he wanted to continue receiving income from the Agency. Compl. ¶ 31. Ed apologized for changing his mind but promised Nancy that he would gift her forty percent of the company stock and, if she continued to work at the Agency, that she would own it someday, once he no longer needed the income. Compl. ¶¶ 33–34, 36, 43–44.

The Agency had a retirement plan, the Edward B. Batal Defined Contribution Plan (the "**Plan**"), for which Ed was the Plan administrator from 2009 until 2018. Compl. ¶¶ 102, 114. In 2019, Ed's wife (and Nancy's stepmother), Marilyn Batal, became the Plan administrator. Compl. ¶¶ 11, 115; Defs.' Mot. to Dismiss ("**Defs.' Mot.**") 12 (ECF No. 11)[2]. Ed and Marilyn were also the trustees of the Plan. Compl. ¶ 116. Ed allowed Marilyn to participate in the Plan even though she was not an

---

[2]    This particular motion to dismiss (ECF No. 11) was filed on behalf of Marilyn—in her individual capacity, as a representative of Ed's estate, and as trustee of the Batal Family Living Trust. Defs.' Mot. to Dismiss 1 (ECF No. 11). A separate motion to dismiss was filed by Marilyn in her capacity as the administrator of the Edward B. Batal Defined Contribution Plan. Def.'s Mot. to Dismiss (ECF No. 19). And a third motion to dismiss was filed by Batal Corp. Def. Batal Corp.'s Mot. to Dismiss (ECF No. 23). Because the second and third motions to dismiss mostly adopt the arguments of the first one, I mostly refer to the first one when discussing the Defendants' arguments, and I refer to this as the "Defendants' motion to dismiss."

Agency employee. Compl. ¶ 117. Meanwhile, Marilyn encouraged or demanded that Ed not allow Nancy to participate in the Plan. Compl. ¶ 79.

Ed, Marilyn, and the Agency also misclassified Nancy as an independent contractor, which deprived her of overtime and benefits, including retirement plan compensation. Compl. ¶¶ 75, 78. Relatedly, the Agency engaged in mail fraud and/or wire fraud by filing tax returns and processing Forms W-2 for Agency employees that misrepresented Nancy as an independent contractor. Compl. ¶ 77. Nancy did not learn that she was being improperly classified as an independent contractor until mid-2017. Compl. ¶ 92. When she found this out, she called the Agency's payroll company and changed her classification to that of an employee. Compl. ¶ 92.

Marilyn also took other steps to deprive Nancy of profits, earnings, and benefits that she was owed from the Agency and to get Ed to pay Nancy less money. Compl. ¶¶ 69, 79, 91, 130. Marilyn would tell Ed that Nancy was on vacation all the time or was not working hard enough. Compl. ¶ 130. She asked another Agency employee to keep track of Nancy's vacations, days off, and lunch breaks, as well as the hours Nancy worked and the amount of time she spent in the office. Compl. ¶ 70. Marilyn also tried to get Ed to sell the Agency to someone other than Nancy. Compl. ¶¶ 79, 130.

By early 2017, Nancy and Ed's relationship was strained. Compl. ¶ 130. Ed's health was declining, as was his mental capacity. Compl. ¶¶ 130, 132, 137. By mid-2017, Ed and Nancy's communications had broken down, and Ed had mostly stopped

speaking to her. Compl. ¶ 88. Marilyn controlled what little communication they had. Compl. ¶ 90.

Ed had also grown too ill to continue managing the Agency. Compl. ¶ 86. Despite not being an employee or officer of the Agency, Marilyn began doing the bookkeeping, and she was paid by the Agency. Compl. ¶¶ 87, 134.

On May 3, 2017, Marilyn suggested to Nancy that she make amends with her father and talk about selling the business. Compl. ¶ 138. The Complaint alleges that this was an effort by Marilyn to get Nancy to agree to let Ed sell the Agency to a third party. Compl. ¶ 139.

In August of 2017, Nancy received an anonymous letter (seemingly from an Agency customer) inquiring about rumors that the letter writer had heard that the Agency was going to be shutting its doors. Compl. ¶ 143.

In November of 2017, Marilyn informed Nancy that there were potential buyers for the Agency. Compl. ¶ 145. Although Marilyn claimed she was "in the middle" of a dispute between Ed and Nancy, the Plaintiff alleges that Marilyn was manipulating Ed to ensure that Nancy would not be able to purchase the Agency. Compl. ¶¶ 145–46. By that point in time, Marilyn knew that Ed was either considering selling the Agency, planning to sell it (at Marilyn's behest), or was in the process of selling it. Compl. ¶ 146. Marilyn told Nancy she should meet with Ed soon about buying the Agency. Compl. ¶ 147.

Nancy subsequently asked Marilyn for a proposed price and the terms of sale. Compl. ¶ 148. And when Nancy asked what was being offered to other potential buyers, Marilyn misled Nancy into believing that no price had been set. Compl. ¶ 149. On November 28, 2017, Marilyn told Nancy that Ed was feeling better and was no longer sure he wanted to sell. Compl. ¶ 150. However, she said that Ed had decided that the business could no longer afford Nancy's salary and that she should start looking for a new job. Compl. ¶ 150. Two weeks later, Marilyn confirmed to Nancy that she was being terminated effective December 31, 2017. Compl. ¶ 157. And she was so terminated. Compl. ¶ 24.

By this point—as early as December of 2017—Ed had begun negotiations with Timothy Curley (from another insurance agency called Curley Associates) about Mr. Curley purchasing the Agency. Compl. ¶¶ 164, 171, 197. At the time she left the Agency, Nancy was not aware that Ed was planning to sell the Agency to a third party, and she expected either that Ed would want her to come back to the Agency or that he would soon die. Compl. ¶¶ 158–59.

On March 21, 2018, Ed, Marilyn, and the Agency transferred most of their real estate into the Batal Family Living Trust (the "**Trust**") in order to shield these assets from Nancy. Compl. ¶¶ 174, 175, 177, 191(A). That same day, Ed signed a new will, which left Nancy out of the Trust. Compl. ¶ 176.

On March 22, 2018, Ed and Mr. Curley agreed on the terms of the sale of the Agency, including that Mr. Curley would purchase the Agency for $335,000 but that Ed and Marilyn would finance the sale. Compl. ¶¶ 178–79. On April 6, 2018, Ed's

attorney called Nancy to ask her to sign a non-compete agreement in order to "fast track" the sale of the Agency and asked her whether she planned to work for the Agency after it was purchased by Mr. Curley. Compl. ¶¶ 160, 182. That same day, Ed and Marilyn sold additional property to the Trust. Compl. ¶¶ 191(B), (C), (E), (G).

On April 13, 2018, the sale of the Agency closed, and on April 25, the Agency sent out a letter to its clients notifying them that it was merging with Curley Associates. Compl. ¶¶ 164, 185. It appears that this may have been when Nancy found out that the sale was a done deal. *See* Compl. ¶ 164. It also appears that this letter went out to Nancy's client list, which Ed, Marilyn, and the Agency had sold to Mr. Curley. *See* Compl. ¶¶ 26, 164, 166–67. Nancy spent thirty years building this client list, and she developed and owned it. Compl. ¶¶ 140, 165–67. Nancy alleges that she could have left the Agency and taken all of her clients with her at any time. Compl. ¶ 60.

On July 20, 2018, Nancy sued Ed in York County Superior Court, alleging various state law contract claims. Compl. ¶ 192. Three days later, Nancy obtained an *ex parte* order of attachment in the amount of $500,000 against some of the properties that Ed, Marilyn, and the Agency had previously transferred to the Trust. Compl. ¶¶ 193–94.

On March 24, 2019, Ed died. Compl. ¶ 113. And at some point later on in 2019, Marilyn liquidated the Plan, transferring the remaining assets to Ed's estate and the Trust, in order to shield these assets from Nancy. Compl. ¶¶ 119–20.

6

Around early 2020, counsel for Ed's estate filed a motion to vacate the attachment that had been issued by arguing that Nancy had committed a fraud on the court when she had redacted a portion of a document that she had attached to her state-court complaint and motion for attachment. Compl. ¶¶ 200, 204. The state court subsequently vacated the attachment order. Compl. ¶ 206. On October 7, 2020, after the attachment was vacated, the Trust sold off two of its properties to RBBJM Realty Trust. Compl. ¶¶ 191(D), (F), (H). Eight days later, Marilyn sold a condo to Lion Holdings, LLC. Compl. ¶ 191(I).

## PROCEDURAL BACKGROUND

In December of 2021, Nancy filed this action against Marilyn (both in her individual capacity and as the representative of Ed's estate), the Agency,[3] the Trust, and the Plan. The Plaintiff brings two types of federal claims, four claims under the Racketeer Influenced and Corrupt Organizations ("**RICO**") Act and four claims under the Employee Retirement Income Security Act ("**ERISA**"). The four RICO claims are brought against all of the Defendants (Counts I–IV). Compl. 39–44. The ERISA claims are as follows: an ERISA interference claim pursuant to ERISA § 510 against the Agency and Marilyn (Count V); a claim for benefits pursuant to ERISA § 502(a)(1)(B) against the Agency and the Plan (Count VI); a breach of fiduciary duty claim pursuant to ERISA § 502(a)(2) against the Agency and Marilyn (Count VII);

---

[3]     The Agency was administratively dissolved in September of 2020. Def. Batal Corp.'s Mot. to Dismiss ("**Def.'s Mot.**") 2 (ECF No. 23). As a result, claims against the Agency can only be enforced against a shareholder of the Agency. Def.'s Mot. 2. Ed was the sole shareholder, Def.'s Mot. 2, so the claims against the Agency are being defended by Marilyn, as the representative of his estate.

and an equitable relief claim pursuant to ERISA § 502(a)(3) against the Agency, Marilyn, and the Plan (Count VIII). Compl. 44–50. The Plaintiff also asserts state claims for: fraud against Marilyn, the Agency, and the Trust (Count IX); negligent misrepresentation against Marilyn, the Agency, and the Trust (Count X); violations of the Maine Uniform Fraudulent Transfers Act (“**MUFTA**”) against Marilyn and the Trust (Count XI); tortious interference with expectancy of inheritance against Marilyn and the Trust (Count XII); tortious interference with prospective economic advantage against Marilyn (Count XIII); unpaid overtime against the Agency (Count XIV); unpaid minimum wages against the Agency (Count XV); and misappropriation of trade secrets in violation of the Maine Uniform Trade Secrets Act against the Agency (Count XVI).[4] Compl. 50–61.

After she filed this case, the Plaintiff moved to stay her state-court action. Pl.'s Consol. Opp'n to Defs.' Mot. to Dismiss (“**Pl.'s Opp'n**”) Ex. A (ECF No. 27). The state court granted that motion and has stayed the state court case “pending resolution of the USDC action” (i.e., this case). Pl.'s Opp'n Ex. A.

## LEGAL BACKGROUND

When evaluating a motion to dismiss, I take “as true all well-pleaded facts alleged in the complaint and draw all reasonable inferences therefrom in the pleader's favor.” *Alston v. Spiegel*, 988 F.3d 564, 571 (1st Cir. 2021) (quoting *Santiago v. Puerto*

---

[4]     For some of the claims brought against Marilyn, the Complaint specifically states that they are brought against her in both her individual and representative capacities (i.e., Counts VII, IX, X, and XI). For others, it is less clear as to whether she is being sued in one or both of these capacities (i.e., Counts V, VIII, XII, and XIII). I assume that all claims against Marilyn are being brought against her in both her individual and representative capacities.

*Rico*, 655 F.3d 61, 72 (1st Cir. 2011)). To be able to get past the motion to dismiss stage, the Plaintiff need not put forward "detailed factual allegations," but she must offer "more than an unadorned, the-defendant-unlawfully-harmed-me accusation" and more than " 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). She also cannot make " 'naked assertions' devoid of 'further factual enhancement.' " *Id.* (quoting *Twombly*, 550 U.S. at 557).

Instead, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

## DISCUSSION

The Defendants make various merits arguments as to why they believe the Plaintiffs' federal claims fail under Federal Rule of Civil Procedure 12(b)(6). They also argue that I should abstain under the *Colorado River* doctrine, *see generally Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976), but because one factor to be considered in the *Colorado River* abstention analysis is the nature of the federal claims, *see Jiménez v. Rodríguez-Pagán*, 597 F.3d 18, 27–28 (1st Cir. 2010), I examine the validity of the federal claims first. Finally, after examining the merits of the federal claims and whether it is appropriate to abstain under *Colorado River*, I will turn to the state claims.

## I.    RICO

### A.    Legal Background

Broadly speaking, the RICO statute prohibits various types of involvement in an "enterprise" that relates to "a pattern of racketeering activity." 18 U.S.C. § 1962. An "enterprise" includes any individual or legal entity. *Id.* § 1961(4). "Racketeering activity" is defined to include a number of enumerated crimes (i.e., potential predicate offenses). *See id.* § 1961(1). And a "pattern of racketeering activity" means that there exist "at least two acts of racketeering activity" occurring within ten years of one another. *Id.* § 1961(5). Although the RICO statute specifies various types of conduct that can violate the RICO statute, all violations share three basic elements—that there is an enterprise, that the enterprise is involved in racketeering activity, and that the racketeering activity constitutes a pattern. *See Lerner v. Colman*, 26 F.4th 71, 77 (1st Cir. 2022); *Ahmed v. Rosenblatt*, 118 F.3d 886, 888–89 (1st Cir. 1997).

"[W]hile two predicate acts are necessary to form a RICO 'pattern,' they may not be sufficient unless they are both 'related' and 'amount to or pose a threat of continued criminal activity.' " *Lerner*, 26 F.4th at 84 (quoting *Schultz v. R.I. Hosp. Tr. Nat'l Bank, N.A.*, 94 F.3d 721, 731 (1st Cir. 1996)). "It is this factor of continuity plus relationship which combines to produce" the requisite "pattern" required by the RICO statute. *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989) (emphasis deleted) (internal quotation marks omitted).

These might be referred to as the relatedness prong and the continuity prong. With respect to the relatedness prong, "[p]redicate acts . . . are sufficiently related if they 'have the same or similar purposes, results, participants, victims, or methods of

commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.' "*Lerner*, 26 F.4th at 84 (quoting *H.J. Inc.*, 492 U.S. at 240). The relatedness of the predicate acts cannot be evaluated at too high a level of generality. *See id.* at 85. And " 'RICO claims premised on mail or wire fraud must be particularly scrutinized' because of the ubiquity of the use of wires and mails and the ease with which isolated frauds can be pleaded as patterns." *Id.* (quoting *Efron v. Embassy Suites (P.R.), Inc.*, 223 F.3d 12, 20 (1st Cir. 2000)). That is, "relatedness requires something more in common than the mere use of mails or wires." *Id.*

With respect to "the continuity prong of the pattern requirement, a plaintiff must show either that the related predicates 'amounted to' continued criminal activity or that there was, even though the predicate acts did not span a significant time, a 'threat' or realistic prospect of continued activity in time yet to come." *Ahmed*, 118 F.3d at 889. "Under the 'amounting to' [(or "closed")] approach, 'a party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time.' " *Feinstein v. Resol. Tr. Corp.*, 942 F.2d 34, 45 (1st Cir. 1991) (quoting *H.J. Inc.*, 492 U.S. at 242), *abrogated in part by Salinas v. United States*, 522 U.S. 52 (1997). "Under the 'threat' [(or "open-ended")] approach, however, even where the predicate acts occur in a narrow time frame and suit is brought before the pattern has taken definitive shape, the requirement can still be satisfied by demonstrating a realistic prospect of continuity over an open-ended period yet to come." *Id.* Continuity may be shown where "the related predicates themselves involve a distinct threat of long-term

racketeering activity, either implicit or explicit." *H.J. Inc.*, 492 U.S. at 242. It can also be shown where "the predicate acts or offenses are part of an ongoing entity's regular way of doing business." *Id.*

Where the alleged activities at issue are "finite [in] nature" and "occur[ ] over a relatively modest period of time," that is not sufficient to "support a jury finding of a RICO pattern under the 'closed' continuity approach." *Efron*, 223 F.3d at 19. That is, there can be no RICO liability in the context of a protracted scheme "where 'the alleged racketeering acts, taken together, comprise a single effort to facilitate a single financial endeavor." *Id.* (quoting *Schultz*, 94 F.3d at 732). As for the question of " 'open-ended' continuity," it must be the case that the allegations demonstrate "that there [was] a risk of a broader scheme, or that the fraudulent acts . . . would continue indefinitely into the future." *Id.* In other words, the analysis of open-endedness considers whether the "racketeering activity [was] a 'regular way of conducting [the] defendant's ongoing legitimate business or of conducting or participating in an ongoing and legitimate RICO enterprise." *Id.* (quoting *H.J. Inc.*, 492 U.S. at 243). Even where the "exact endpoint" of a fraud is not clear from the pleadings because it depends on how it progresses, that is not the same as "the open-ended continuity illustrated by the single scheme described in *H.J. Inc.*, an endeavor that apparently would have gone on without end had it not been detected." *Id.* at 20.

"[W]here the racketeering activity exceeds in duration [a] few weeks or months . . . but is neither so extensive in reach nor so far beyond the minimum time period that common sense compels a conclusion of continuity, the fact that a defendant has

been involved in only one scheme with a singular objective and a closed group of targeted victims" is "highly relevant." *Id.* at 18 (internal quotation marks omitted). As the First Circuit has further explained:

> Virtually every garden-variety fraud is accomplished through a series of wire or mail fraud acts that are "related" by purpose and spread over a period of at least several months. Where such a fraudulent scheme inflicts or threatens only a single injury, we continue to doubt that Congress intended to make the availability of treble damages and augmented criminal sanctions under RICO dependent solely on whether the fraudulent scheme is well enough conceived to enjoy prompt success or requires pursuit for an extended period of time.

*Id.* at 20–21 (quoting *U.S. Textiles, Inc. v. Anheuser-Busch Cos.*, 911 F.2d 1261, 1268 (7th Cir. 1990)). The First Circuit has elsewhere observed that "a single 'crime' (in the ordinary, nontechnical sense of that word)" might consist of several different parts, each of which might "constitute separate criminal acts or 'crimes' (in the technical sense that each, separately, violates a specific statute)." *Apparel Art Int'l, Inc. v. Jacobson*, 967 F.2d 720, 722 (1st Cir. 1992). But "those several separate criminal parts, taken together, do not generally make out a 'pattern.' " *Id.* "To hold otherwise would mean that many individual bank robberies, frauds, drug sales, embezzlements, and other crimes as well would automatically fall within the scope of the RICO statute, a result contrary to RICO's basic purpose." *Id.*

Before moving on to consider the Plaintiff's particular claims, I first describe two First Circuit cases in some detail. These two cases help to give some context for the legal principles that I have just described, and they set the stage for my analysis. In *Efron v. Embassy Suites (Puerto Rico), Inc.*, the plaintiff and his partners developed and operated a hotel in San Juan. 223 F.3d at 13. The plaintiff contributed

a substantial sum to the property and owned almost one-quarter of the equity. *Id.* However, the plaintiff alleged that several of his partners "deliberately caused the hotel project to lose money by generating excessive construction costs, engaging in sweetheart leases with the on-site restaurant and gift shop, overpricing rooms, and performing other acts of mismanagement." *Id.* at 14. Because the partnership agreement required the partners to cover any shortfalls (or have their interest reduced), the plaintiff was forced to invest additional money into the hotel. *Id.* And the First Circuit understood the plaintiff to be alleging that the defendants were trying to squeeze him out of the partnership. *Id.* at 19–20.

The First Circuit concluded that there was no broader scheme at play. "Almost by definition, the alleged fraud had a limited life expectancy." *Id.* at 19. In other words, the plaintiff was alleging that his partners were trying to defraud him, and that was the end of it. "Had Efron argued that the defendants planned to operate the hotel indefinitely at a paper loss as a means of perpetually defrauding him, rather than asserting the specific objective of squeezing him out of the Partnership, he would have a stronger argument for an open-ended RICO pattern." *Id.* at 20. "Indeed, Efron's refusal to contribute any more funds and his decision to file suit to protect his interest suggest that the objective was virtually accomplished." *Id.* This was insufficient to be able to establish a RICO pattern. *Id.* at 21. "Taken together, the acts as alleged comprise[d] a single effort, over a finite period of time, to wrest control of a particular partnership from a limited number of its partners." *Id.*

My other guidepost is *Apparel Art International, Inc. v. Jacobson*. In that case, the plaintiff subcontractor alleged that a contractor had bribed, and made false statements to, a government contracting officer in order to secure a Department of Defense contract. 967 F.2d at 721. The plaintiff alleged that it was unaware of the bribes and the false statements when the contractor awarded it the subcontract. *Id.* When the bribes came to light, the government canceled the contract, and the plaintiff brought an arbitration proceeding against the contractor. *Id.* But, in the meantime, the contractor fraudulently conveyed its assets to its owners to conceal those assets from the plaintiff. *Id.*

The First Circuit concluded that the circumstances surrounding securing the contract "took place over a comparatively short period of time . . . [a]nd, taken together, they comprise[d] a single effort to obtain (and to keep) one $96 million Defense Department contract." *Id.* at 723. In other words, they were "separate parts of a single criminal episode." *Id.* The fraudulent conveyance, on the other hand, "was not part of the conduct aimed at securing the contract, and, according to the complaint, it took place several years later." *Id.* at 724. That conduct, the First Circuit said, was "too *un* related—*too* separate, *too* distinct, *too* obviously related to a simple effort to avoid a later court judgment—to permit a finding that, taken together with the earlier acts, it [was] part of a racketeering 'pattern.' " *Id.*

## B.   The Plaintiff's RICO Allegations

The Plaintiff's specific RICO allegations are relatively sparse. I recognize that the Plaintiff has "repeat[ed] and realleg[ed]" most of the allegations in her Complaint with respect to each RICO count, Compl. ¶¶ 209, 222, 226, 229, so, in theory, most of

15

the Complaint could be used to support her RICO claims. Nevertheless, looking at the specific allegations made with respect to the RICO counts, as well as the Plaintiff's opposition, it appears that the Plaintiff is relying only on the following allegations to support her RICO claims:

- The alleged "enterprise" consists of Marilyn, the Agency, and the Trust. Compl. ¶ 210.

- The aim of the enterprise was "to defraud Nancy of her clients, profits, wages, retirement, inheritance, property, and the Agency itself." Compl. ¶ 211.

- The predicate acts that the enterprise engaged in were embezzlement from pension and welfare funds (§ 664), mail fraud (§ 1341), wire fraud (§ 1343), financial institution fraud (§ 1344), unlawful welfare fund payments (§ 1954), money laundering (§ 1956), theft of trade secrets (§ 1832), and economic espionage (§ 1831). Compl. ¶ 214.

- The specific facts to which the Plaintiff points in her response as supporting her RICO allegations are: the theft of Nancy's client list, the anonymous letter, emails relating to the sale of the Agency, the fraudulent transfers, false statements to the York County Superior Court to get the attachments dissolved, "fraudulent letters," "closing documents," "false claims to the IRS" (specifying false Forms W-2 and 941), and "illegal payroll practices." Pl.'s Opp'n 18–19.

Because these are the allegations on which the Plaintiff relies in defending the validity of her RICO claims, these are the allegations that I consider in evaluating whether she has pleaded sufficient facts to overcome the Defendants' motions to dismiss.

### C.   Analysis

To begin with, although the Plaintiff lists a number of predicate acts in her Complaint and in her opposition to the motion, she fails to explain how several of them apply to this case. She puts forward financial institution fraud as a potential predicate, but she never mentions any financial institutions in her Complaint. She

mentions § 1954, which deals with kickbacks in relation to employee benefits plans. But her Complaint identifies no transactions that could be construed as a kickback. The Plaintiff also points to money laundering, but she fails to identify the associated specified unlawful activity or even the type of money laundering. To the extent that she is referring to the fraudulent transfers, she does not offer any allegations that these transfers involved the proceeds of any specified unlawful activity.[5] The Plaintiff also alleges economic espionage, which involves espionage on behalf of a foreign government, instrumentality, or agent, 18 U.S.C. § 1831(a), but there is no such allegation in the Complaint.

That leaves four potential predicate offenses— embezzlement from a pension or welfare fund, theft of trade secrets, mail fraud, and wire fraud. There is one allegation to support the idea that Ed and Marilyn embezzled from the Plan; the Plaintiff alleges that they treated the Plan as their own personal bank account. The theft of trade secrets allegation appears to stem from the allegation that the Agency sold Nancy's client list.

With respect to mail and wire fraud, the Plaintiff haphazardly points to mailings and wires but misses the point that a mailing or a wire must be part of a scheme to defraud for there to be mail or wire fraud. *See Bonilla v. Volvo Car Corp.*, 150 F.3d 62, 66 (1st Cir. 1998) ("[T]he use of the mails or interstate wire or radio

---

[5]      In order for the sale of the properties to constitute money laundering, it would have to be the case that the properties themselves were proceeds of a specified unlawful activity. *See* 18 U.S.C. § 1956 (requiring that the financial transaction at issue "involve[ ] the proceeds of specified unlawful activity"). But there are no allegations in the Complaint that that is the case. Rather, the Complaint only alleges that these transfers were made to conceal Ed and Marilyn's assets from Nancy, not that the properties themselves were proceeds of a specified unlawful activity.

communication [must be] in furtherance of the scheme."); *McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.*, 904 F.2d 786, 792 n.10 (1st Cir. 1990) (noting that the mail fraud statute does not encompass mailings *resulting* from a fraudulent scheme, but only those *in furtherance* of the scheme); *cf. Schmuck v. United States*, 489 U.S. 705, 710 (1989) ("The federal mail fraud statute does not purport to reach all frauds, but only those limited instances in which the use of the mails is a part of the execution of the fraud . . . ." (quoting *Kann v. United States*, 323 U.S. 88, 95 (1944))). It thus does not make sense to say that the anonymous letter or random emails that were sent as a part of the sale of the Agency could support a predicate offense of mail or wire fraud. The Plaintiff does not allege that the letter or those emails were sent in *furtherance* of any fraud.

The only colorable claims of mail and wire fraud that the Plaintiff identifies are tied to the fraudulent transfers, the false tax forms that were sent to the IRS, and some of the conduct before the state court. With respect to the conduct before the state court, to the extent that there were false statements made in letters or electronic filings, those could potentially support a mail or wire fraud predicate.[6] Specifically, the Plaintiff identifies a letter from Marilyn in which she falsely accused the state court judge of bias. Compl. ¶ 205. I assume that that could support a claim for mail or wire fraud.

---

[6]   The Plaintiff references false statements to the state court, but while obstruction in a *federal* case is a RICO predicate, *see* 18 U.S.C. § 1961(1) (listing federal obstruction of justice statutes as potential predicate acts), obstruction in a state case is not, *see id.* § 1961(1)(A) (listing state crimes that serve as potential RICO predicates). The only way these false statements might be a RICO predicate is if they constitute wire fraud or mail fraud.

To sum up, then, the only facts that could support potential predicate acts to establish a pattern of racketeering activity are: Ed and Marilyn's alleged embezzlement from the Plan, the alleged theft of Nancy's client list, the allegedly false tax documents, the allegedly fraudulent transfers, and Marilyn's bias accusation.[7]

Even assuming these acts could constitute potential predicate offenses for the Plaintiff's RICO claims, there is no detectable "pattern" amongst them because there is a lack of continuity. The continuity prong requires proof of a series of related predicates occurring over a substantial period of time or of a threat of continuing criminal activity. But there is no allegation to support either possibility. While the Plaintiff alleges that there was a threat of ongoing criminal activity, Compl. ¶¶ 215, 218, this is a legal allegation that I disregard, *see Iqbal*, 556 U.S. at 678. And the factual allegations do not support this contention.

The Plaintiff acknowledges that all of these acts (except for the fraudulent transfers) were geared towards one thing—defrauding Nancy of her clients, profits, wages, retirement, inheritance, property, and the Agency itself. Just like the frauds

---

[7]   The Plaintiff's opposition arbitrarily refers to other purported factual allegations as supporting a pattern of RICO activity, but none holds water. She references "closing documents," but there is no discussion of closing documents (much less false closing documents) in the Complaint. Pl.'s Consol. Opp'n to Defs.' Mots. to Dismiss ("**Pl.'s Opp'n**") 19 (ECF No. 27). She also references "fraudulent letters," Pl.'s Opp'n 19, but the only letters the Complaint references as being sent—a letter that has not been mailed obviously cannot give rise to mail fraud—are the anonymous letter (which has no allegation of falsity), the letter about the sale of the Agency (same), and the letter from Marilyn to the state court, which I discussed above. Compl. ¶¶ 143, 164, 205. The Plaintiff also references "illegal payroll practices," Pl.'s Opp'n 19, but, with respect to the allegations related to Nancy being wrongly classified as an independent contractor, I see no connection between the Defendants' purportedly illegal payroll practices and any RICO predicate other than the allegedly false tax documents discussed above.

in *Efron* and *Apparel Art*, which were limited in scope, the Defendants' efforts to defraud Nancy "had a limited life expectancy." *See Efron*, 223 F.3d at 19; *Apparel Art*, 967 F.2d at 723. There was no goal to perpetually defraud Nancy, but merely to push her out of the Agency. *See Efron*, 223 F.3d at 20 n.10 ("[A]lthough the amended complaint and RICO case statement refer to a general goal to defraud Efron and the other victim partners of 'more money,' the amended complaint read as a whole does not depict this as a long-term objective but simply as a necessary step toward defendants' specific goal of 'taking unrestricted control of the enterprise.' "). And the success of the endeavor is clear from the fact of the lawsuit. *See id.* at 20. "Taken together, the acts as alleged comprise[d] a single effort, over a finite period of time, to wrest control of" the Agency from Nancy. *See id.* at 21. Each of the pieces of the scheme that the Plaintiff has identified—misclassifying her as an independent contractor, stealing her client list, etc.—were but "separate parts of a single criminal episode." *See Apparel Art*, 967 F.2d at 723. They were not individual predicate acts that could comprise a pattern of racketeering activity.

Meanwhile, the unrelated wrongs that the Plaintiff alleges—the false tax filings, the embezzlement from the Plan— are "too *un* related—*too* separate [and] *too* distinct." *See id.* at 724. The Plaintiff fails to identify a way in which these purported illegalities were part of a pattern of racketeering activity—they bear no apparent relationship to the plan to defraud Nancy. Instead, they seem to be part of a separate scheme to enrich Ed and Marilyn that had nothing to do with Nancy. Meanwhile, the subsequent conduct that the Plaintiff alleges—lying to the state court and the

fraudulent transfers—are "too *un* related—*too* separate, *too* distinct, *too* obviously related to a simple effort to avoid a later court judgment—to permit a finding that, taken together with the earlier acts, [they were] part of a racketeering 'pattern.' " *See id.* at 724. Once the goal of pushing Nancy out was achieved, there was nothing for the Defendants to do except to preserve their gains by making the fraudulent transfers and trying to stymie the state-court proceedings. But there was no threat of future criminal activity. *See H.J., Inc.*, 492 U.S. at 243 n.4 (noting the congressional "intent that RICO reach activities that amount to or threaten long-term criminal activity").

The Plaintiff does not allege a situation where the Defendants operated their business in the same fraudulent manner as a matter of course, pushing people out of the Agency one by one by one. *See id.* at 243 ("The continuity requirement is likewise satisfied where it is shown that the predicates are a regular way of conducting defendant's ongoing legitimate business . . . ."). The Complaint is all about Nancy. It explains how Nancy was targeted and how the Defendants conspired to defraud her. But the fact that the scheme was so targeted and narrowly confined is exactly why there is no pattern of racketeering activity that could sustain a RICO charge. Counts I through IV are **DISMISSED** for failure to state a claim.

## II.   ERISA

The Defendants argue that the Plaintiff's ERISA claims should be dismissed because the Plaintiff fails to allege that she was a participant, or sought to become a participant, in the Plan. Defs.' Mot. 13–17. The Defendants also contend that the

Plaintiff's interference, breach of fiduciary duty, and equitable claims fail on the merits. Defs.' Mot. 17–18.

### A.     Claims Against the Plan

Before addressing the substance of the Plaintiff's ERISA claims, I address the fact that she has brought two of her ERISA claims (Counts VI and VIII) against the Plan. The Plan has filed a motion to dismiss all claims against it, Def.'s Mot. to Dismiss (ECF No. 19), and the Plaintiff has conceded that, because it appears that the Plan does not hold any assets and is no longer in existence, no action can be maintained against the Plan. Pl.'s Opp'n 10–11. As a result, Counts VI and VIII are **DISMISSED** against the Plan without prejudice.

### B.     Whether the Plaintiff was a "participant" in the Plan

ERISA defines a "participant" as "any employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan." 29 U.S.C. § 1002(7). This encompasses "employees in, or reasonably expected to be in, currently covered employment," as well as "former employees who have a reasonable expectation of returning to covered employment or who have a colorable claim to vested benefits." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 117 (1989) (internal quotation marks omitted). "In order to establish that he or she 'may become eligible' for benefits, a claimant must have a colorable claim that (1) he or she will prevail in a suit for benefits, or that (2) eligibility requirements will be fulfilled in the future." *Id.* at 117–18.

Although a non-participant typically lacks standing to bring an ERISA claim, there is one exception to this rule, "where, 'but for' [an] employer's wrongful conduct [the plaintiff] would have been a 'participant'" in a plan. *Boucher v. Williams*, 13 F. Supp. 2d 84, 103 (D. Me. 1998); *see Vartanian v. Monsanto Co.*, 14 F.3d 697, 702 (1st Cir. 1994) ("To hold otherwise would imply that when an employer breaches its fiduciary duty to an employee under ERISA, the employee would have standing to sue only if the employee finds out all of the facts constituting the breach prior to his receipt of retirement benefits.").

The Defendants argue that the Plaintiff was not a participant in the Plan and that she thus lacks standing to bring any ERISA claims. But the Plaintiff's claims are rooted in the idea that the only reason she was not a participant in the Plan was because of the Defendants' wrongdoing. This case thus fits squarely into the circumstances outlined in *Vartanian*.[8] As a result, under the law in this circuit, the Plaintiff is considered to be a "participant" within the § 1002(7) definition and has standing to bring her claim.

### C.    Exhaustion

"Before a plaintiff asserts an ERISA claim . . . he first must exhaust his administrative remedies."[9] *Madera v. Marsh USA, Inc.*, 426 F.3d 56, 61 (1st Cir.

---

[8]      In arguing to the contrary, the Defendants rely on a Tenth Circuit case, *Raymond v. Mobil Oil Corp.*, 983 F.2d 1528 (10th Cir. 1993). But when the First Circuit decided *Vartanian*, it noted the Tenth Circuit's contrary decision in *Raymond*. *See Vartanian v. Monsanto Co.*, 14 F.3d 697, 702 n.4, 703 (1st Cir. 1994).

[9]      An employer must, by law, provide for administrative remedies. *Madera v. Marsh USA, Inc.*, 426 F.3d 56, 61 (1st Cir. 2005).

2005). The Defendants argue that the Plaintiff fails to allege that she sought to become a participant in the Plan and thus that she has not exhausted her administrative remedies.

The problem with this argument is that the Complaint gives rise to the inference not only that the Defendants would not allow Nancy to participate in the Plan, but that the Defendants also concealed the existence of the Plan from her. All of the cases that the Defendants cite involve plaintiffs who were denied *benefits*, rather than being denied entry into a plan in its entirety, and in those circumstances, it is clear that exhaustion is required. *See, e.g.*, *id.*. But I question how the Plaintiff could have sought to become a participant in a plan that she did not even know existed. *See* Compl. ¶ 122 (alleging that Nancy was not provided with various Plan documents). ERISA's exhaustion requirement is "judicially created," and while it "serves many important purposes," *Angevine v. Anheuser-Busch Cos. Pension Plan*, 646 F.3d 1034, 1037 (8th Cir. 2011), the application of an exhaustion requirement that is not statutorily required is "within the discretion of the district court." *Accion Social de P.R., Inc. v. Viera Perez*, 831 F.2d 365, 369 (1st Cir. 1987). Depending on when Nancy found out about the existence of the Plan, and what information she was able to gather, there may be reason to waive this requirement. *See Perrino v. S. Bell Tel. & Tel. Co.*, 209 F.3d 1309, 1315 (11th Cir. 2000) ("[A] district court has the sound discretion to excuse the exhaustion requirement . . . where a claimant is denied meaningful access to the administrative review scheme in place." (internal quotation marks omitted)).

This is not to say that the Defendants cannot raise an exhaustion defense at a later stage of these proceedings.[10] But, at this early stage, given that I do not know when Nancy learned of the Plan[11] or whether she had any opportunity to exhaust her administrative remedies, I conclude that dismissing these claims would be premature. This issue would benefit from further discovery.

### D.     Merits Issues

With respect to the ERISA interference claim, the Defendants contend that the Plaintiff has not alleged sufficient facts to support her claim that she was fired for attempting to access her benefits. I disagree. The Plaintiff alleges that she changed her classification from being an independent contractor to being an employee in mid-2017 and that she was then fired just a few months later because the Agency could not "afford to pay [her] salary." Compl. ¶¶ 92, 150. It is reasonable to infer from these facts that the Nancy's efforts to change her status to being an employee—and thus becoming potentially eligible to participate in the Plan and thereby a more expensive employee—contributed to why she was fired. These allegations are sufficient to be able to survive a motion to dismiss.

---

[10]     I note that the Plaintiff points to a circuit split over the issue of whether an ERISA § 510 claim requires administrative exhaustion, and she argues that because § 510 is a statutory claim, it does not require exhaustion. *See* Pl.'s Opp'n 14. The First Circuit has previously rejected this argument. *See Madera*, 426 F.3d at 63 ("A claim for the wrongful denial of benefits, such as the one here, is not to be treated as a 'statutory' claim, but rather as a 'contractual' one."); *Drinkwater v. Metro. Life Ins. Co.*, 846 F.2d 821, 826 (1st Cir. 1988) ("If we were to allow claimants to play this characterization game, then the exhaustion requirement would be rendered meaningless.").

[11]     While the Plaintiff provides some information about the Plan's older Forms 5500 and its 1984 formation, Compl. ¶¶ 102–12, it is not clear to me whether she discovered this information contemporaneously or whether this is information that she learned later on, such as through discovery in the state court proceedings.

Turning to the breach of fiduciary duty claim, the Defendants contend that the Plaintiff's allegation that Ed and Marilyn treated the Plan as their own personal bank account is too vague to support a breach of fiduciary duty claim. Defs.' Mot. 18. I disagree on this point as well. This allegation, in combination with the allegation that Marilyn transferred all of the money out of the Plan in order to shield it from Nancy, Compl. ¶¶ 8, 119–20, makes it plausible that Ed and Marilyn breached their fiduciary duties to the Plan.

The Defendants also contend that the Plaintiff does not allege sufficient facts to support her claim for equitable relief, arguing that the Plaintiff offers "no reasons for awarding" such relief. Defs.' Mot. 18. The allegations discussed above provide a sufficient basis to support this claim for equitable relief.

The motions to dismiss the ERISA claims are **DENIED**.

## III.   *Colorado River* **Abstention**

I next consider the issue of whether *Colorado River* abstention is appropriate. Because "there is nothing unusual about parallel litigation resolving similar controversies in both state and federal court," *Nazario-Lugo v. Caribevisión Holdings, Inc.*, 670 F.3d 109, 114 (1st Cir. 2012), "[i]t has long been established that the presence of parallel litigation in state court will not in and of itself merit abstention in federal court," *Jiménez*, 597 F.3d at 27. "Concurrent federal-state jurisdiction over the same controversy does not generally lessen the federal courts' 'virtually unflagging obligation . . . to exercise their jurisdiction given them.'" *Id.* (alteration in original) (quoting *Colo. River*, 424 U.S. at 817). This remains true even though "twin litigation may result in some measure of inefficiency and wasted resources, and there

is some risk of inconsistent decisions from different courts on the same or similar issues." *Nazario-Lugo*, 670 F.3d at 114.

"In special cases, the pendency of a similar action in state court may merit federal abstention . . . ." *Jiménez*, 597 F.3d at 27. This abstention doctrine—known as the *Colorado River* doctrine—"is to be used sparingly and approached with great caution." *Nazario-Lugo*, 670 F.3d at 115. It is to be deployed only where there exist " 'exceptional' circumstances displaying 'the clearest of justifications' for federal deference to the local forum in the interest of 'wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation.' " *Id.* (quoting *Colo. River*, 424 U.S. at 817–19).

The First Circuit has compiled a "non-exclusive list of factors" to consider when evaluating whether the requisite exceptional circumstances exist. *Jiménez*, 597 F.3d at 27. Those eight factors are:

> (1) whether either court has assumed jurisdiction over a res; (2) the geographical inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; (4) the order in which the forums obtained jurisdiction; (5) whether state or federal law controls; (6) the adequacy of the state forum to protect the parties' interests; (7) the vexatious or contrived nature of the federal claim; and (8) respect for the principles underlying removal jurisdiction.

*Id.* at 27–28. "No one factor is necessarily determinative; a carefully considered judgment taking into account both the obligation to exercise jurisdiction and the combination of factors counselling against that exercise is required." *Colo. River*, 424 U.S. at 818–19. These factors are "to be applied in a pragmatic, flexible manner with a view to the realities of the case at hand." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 21 (1983). And "[t]he weight to be given any given factor

depends on the circumstances." *Nazario-Lugo*, 670 F.3d at 115. But "the balance [is] heavily weighted in favor of the exercise of jurisdiction." *Moses H. Cone*, 460 U.S. at 16. The cases in which these factors point towards abstention "are few and far between." *Jiménez*, 597 F.3d at 28.

## A.   Whether the Actions Are Parallel

The *Colorado River* doctrine applies only to "parallel state court action." *Ambrose v. New Eng. Ass'n of Schs. & Colls., Inc.*, 100 F. Supp. 2d 48, 49 (D. Me. 2000); *see Villa Marina Yacht Sales, Inc. v. Hatteras Yachts*, 915 F.2d 7, 8 (1st Cir. 1990) (describing how the *Colorado River* doctrine "permits federal courts to decline jurisdiction in favor of parallel state litigation"). The Plaintiff cursorily remarks that there is not in fact parallel litigation here because the state-court action has been stayed, *see* Pl.'s Opp'n 6, although she fails to offer any support for this proposition. For their part, the Defendants contend that the stay "does not alter the existence of the state court litigation," but they, too, fail to engage with the issue. *See* Defs.' Reply in Supp. of their Mots. to Dismiss 2 (ECF No. 28).

It appears that, when faced with similar circumstances, many courts have considered a state-court stay as reason for the federal case to proceed. *See Vangsness v. Deutsche Bank Nat'l Tr. Co.*, No. 12 C 50003, 2012 WL 5989354, at *6 (N.D. Ill. Nov. 29, 2012) (finding no "sufficient basis to find the actions are parallel or that extraordinary circumstances exist requiring abstention" where the state case had been stayed pending resolution of federal case); *Siler v. Webber*, No. 3:05-CV-341, 2009 WL 10680026, at *1, 5–6 (E.D. Tenn. Mar. 5, 2009) (declining to abstain at least in part because "the danger of piecemeal, duplicative litigation is reduced by the state

28

court's order staying the trial in the state case" pending disposition of the federal case); *Nat'l Cas. Co. v. Jordache Enters., Inc.*, 848 F. Supp. 1112, 1118–19 (S.D.N.Y. 1994) (holding that exercising jurisdiction "presents absolutely no risk of affronting the concern for comity that is at the heart of the 'exceptional circumstances' doctrine" where state court action had been stayed pending outcome of the federal litigation); *cf. Voktas, Inc. v. Cent. Soya Co.*, 689 F.2d 103, 105 (7th Cir. 1982) (noting that, if a federal court were required to issue a stay where a related state-court proceeding was stayed, "the practical result might be termed 'judicial paralysis'—both the federal and the state actions would be stayed and no progress toward resolution of the dispute would occur") *Id.* I thus consider the fact that the state court has stayed its hand to weigh in favor of exercising jurisdiction.

## B.    Whether Exceptional Circumstances Are Present

The Defendants acknowledge that two of the eight factors outlined in *Jiménez* are not at issue—geographical inconvenience (since York County and Cumberland County are equally convenient) and respect for principles underlying removal jurisdiction (since this case does not involve removal). I analyze the other six.

### 1.    Factor 1 - Whether either court has assumed jurisdiction over a res

The Defendants contend that this factor favors them because probate administration is under way and because the Plaintiff is seeking damages and other relief under her tortious interference with an expectancy of inheritance claim, as well as orders with respect to real property. Defs.' Mot. 4. And the Defendants contend that there is a risk of inconsistent orders with respect to the identity and disposition

29

of assets of Ed's estate between the federal and state courts. Defs.' Mot. 4. The Plaintiff, meanwhile, contends that she is not asking for the Court to dispose of any property.[12] Pl.'s Opp'n 7.

This factor is "more concerned with the disposition of property than the actual exercise of in rem jurisdiction." *Jiménez*, 597 F.3d at 28 n.6. But the salient point is that the Complaint does not seek an order pertaining to any particular piece of property. Rather, the Plaintiff is only seeking damages to compensate for her alleged harms. Compl. ¶¶ 42–44, 46, 48–52, 54–59, 61. Although she seeks "disgorg[ement]" of "the real estate, retirement plan income, retained wages, and all other profits illegally gained by Defendants, as well as disgorgement or forfeiture of any proceeds of their fraud," Compl. ¶ 221, her claims for relief make clear that she only seeks "disgorgement of profits," Compl. 42–44, 49. That is, she is seeking the *money* that she says the Defendants wrongfully made, not the disposition of any particular property. Similarly, although the Complaint mentions the "avoidance of the transfers" that she says violated the MUFTA, context makes clear that she is not seeking the property itself, but is only seeking to avoid the relevant transfers in order to liquidate the property so she can get damages. Compl. 54. Because the Plaintiff is not seeking to be awarded any particular property, there is no risk of inconsistent judgments as to disposition of property. This factor favors retaining jurisdiction.

---

[12]     Confusingly, the Plaintiff appears to make the opposite argument at the end of her opposition. Pl.'s Opp'n 22 (describing herself as "a third person who seeks 'to recover property' held by the trust"). But, because this is not consistent with the requests for relief in the Complaint, as I explain, I disregard this baseless contention.

## 2.    Factor 3 - Desirability of avoiding piecemeal litigation

Factor three examines whether "piecemeal litigation" can and should be avoided. "The 'piecemeal litigation' to be avoided is something more than just the repetitive adjudication that takes place in all cases implicating [the] *Colorado River* doctrine." *Jiménez*, 597 F.3d at 29. "Concurrent federal-state jurisdiction over the same action will necessarily involve some degree of 'routine inefficiency that is the inevitable result of parallel proceedings.' " *Id.* (quoting *Villa Marina*, 915 F.2d at 16). This is only problematic if there is something "that places the case beyond the pale of duplicative proceedings." *Id.*

The Defendants complain that this action is duplicative of the state action and criticize the Plaintiff for bringing this "second action alleging sixteen new claims based on the same core facts, and . . . do[ing] so *three years* after . . . initiat[ing] her state court action." Defs.' Mot. 5. While it is difficult to assess without more information about the state-court action,[13] I am not so convinced that this action is duplicative. Although these cases may overlap, the federal case appears to be far broader in scope than the state case. The state case is a contract case against Marilyn as the representative of Ed's estate, Compl. ¶ 192; Defs.' Mot. Ex. A 1 (ECF No. 11-1), while the federal case also sweeps in Marilyn in her individual capacity, the Trust, the Agency, and the Plan, and it asserts other types of claims, including RICO and ERISA claims. While I have concluded that the RICO claims and the claims against

---

[13]     The parties have not provided me with any of the litigation documents from that case, so it is difficult for me to assess how much these cases do (or do not) overlap.

the Plan are meritless, the inclusion of the ERISA claims and the claims against these other defendants remains significant. This factor favors retaining jurisdiction.

### 3.    Factor 4 - Order in which forums obtained jurisdiction

Although factor four is nominally focused on "the order in which the courts obtained jurisdiction," this is "a misnomer, as 'the relative progress of the suits is more important than the strict order in which the courts obtained jurisdiction.' " *Jiménez*, 597 F.3d at 30 (quoting *Gonzalez v. Cruz*, 926 F.2d 1, 4 (1st Cir. 1991)). As a result, the question is which "case . . . is the more advanced at the time the *Colorado River* balancing is being done." *Id.* at 31 (quoting *Elmendorf Grafica, Inc. v. D.S. Am. (E.), Inc.*, 48 F.3d 46, 52 (1st Cir. 1995)). Without the stay in place, this factor would unquestionably favor abstention because the state-court proceeding appears to be trial-ready. *See* Defs.' Mot. Ex. A 18. But because a stay has now been granted, this factor is a wash, and it may even favor retaining jurisdiction.

### 4.    Factors 5 (whether state or federal law controls), 6 (adequacy of the state forum to protect the parties' interests), and 7 (vexatious or contrived nature of federal claim)

As I have already concluded, the Plaintiff's ERISA claims are viable. Federal law controls with respect to these claims. These claims are not vexatious or contrived. And, as the Defendant acknowledges, the state forum is not adequate to protect the Plaintiff's interests because the state court lacks concurrent jurisdiction over three of the Plaintiff's four ERISA claims. *See* 29 U.S.C. § 1132(e)(1) ("Except for actions [to recover benefits], the district courts of the United States shall have exclusive jurisdiction of civil actions under this subchapter . . . ."); Defs.' Mot. 4 n.4. The fact

32

that the Plaintiff could not bring her ERISA claims in state court weighs heavily in favor of retaining jurisdiction.

Because most if not all of the relevant factors decidedly favor retaining jurisdiction, *Colorado River* abstention is not appropriate.

## IV.   State Law Claims

The Defendants make two arguments as to why the Plaintiff's state claims should be dismissed. The first is that, because her "federal claims are plainly not viable," I should decline to exercise supplemental jurisdiction. Defs.' Mot. 18–19. As explained above, I find that the Plaintiff has alleged sufficient facts with respect to her ERISA claims. I will thus exercise supplemental jurisdiction over any viable state law claims.

The second argument is that all of the claims against Marilyn in her capacity as the representative for Ed's estate are time-barred. Defs.' Mot. 19–20. Maine law requires that claims brought against an estate that arose prior to the death of the decedent be brought no later than nine months after the decedent's death. 18-C M.R.S. § 3-803(1). In this case, that means that all claims that arose prior to the death of Ed expired on December 24, 2019. Defs.' Mot. 20. For claims arising after a decedent's death, the statute of limitations expires four months after the claim accrues. *Id.* § 3-803(3). As the Defendants explain, the Plaintiff does not allege that the Defendants engaged in any unlawful conduct after October 15, 2020, when Marilyn sold the condo to Lion Holdings, LLC. Defs.' Mot. 20; Compl. ¶ 191(I). That means that the statute of limitations for any post-death claims against Ed's estate expired on February 15, 2021.

33

The Plaintiff does not dispute any of this. Instead, she emphasizes that the statutes of limitations in § 3-803 do not affect the personal liability of an estate's personal representative, in this case Marilyn. Pl.'s Opp'n 21–22. But this is beside the point. The Defendants do not argue that the claims against Marilyn in her individual capacity are time-barred. And this does not respond to the Defendants' argument that the claims against Marilyn in her representative capacity have lapsed.

The Plaintiff also argues that § 3-803 excludes demands or disputes regarding title to specific assets. Pl.'s Opp'n 21. But I do not understand why that matters. As I explained above, I do not understand the Complaint to be making any demand regarding title to any particular asset.

The Plaintiff also points out that the definition of "claim" within § 3-803 includes "liabilities of the decedent or a protected person." Pl.'s Opp'n 21–22. And, she says, because none of the Defendants is the decedent or a protected person, claims against these Defendants do not fall within the scope of § 3-803. Pl.'s Opp'n 22. But this ignores the fact that § 3-803 refers not just to "claims" in general, but to "claims against a decedent's estate." § 3-803(1), § 3-803(3). The claims that the Defendants seek to dismiss are claims against Ed's estate (i.e., against Marilyn as the representative of the estate), which fall squarely within § 3-803.

The state law claims against Marilyn in her representative capacity are time-barred and are **DISMISSED**.

## CONCLUSION

For the reasons stated above, I **GRANT IN PART** and **DENY IN PART** the motion to dismiss by the Trust and by Marilyn in her individual capacity and in her capacity as the representative of Ed's estate (ECF No. 11) and the motion to dismiss by the Agency (ECF No. 23). The RICO claims (Counts I, II, III, and IV) are **DISMISSED**. All claims against Marilyn in her capacity as the representative of Ed's estate are **DISMISSED**. The Plan's motion to dismiss (ECF No. 19) is **GRANTED**, and all claims against the Plan are **DISMISSED**.

With respect to the pending motion for an order of attachment, the Plaintiff has requested leave to file a supplement to her motion for an order of attachment. Pl.'s Reply Mem. in Supp. of Mot. for Attachment 2 (ECF No. 17). The Plaintiff has 14 days to file this supplement to her motion. The Defendants, should they wish to do so, may file a response within 14 days of the Plaintiff filing her supplement.

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 15th day of August, 2022.