# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| NANCY BATAL-SHOLLER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Docket No. 2:21-cv-00376-NT |
| | ) |
| MARILYN BATAL, et al., | ) |
| | ) |
| Defendants. | ) |

## ORDER ON PLAINTIFF'S SUPPLEMENTAL MOTION
## FOR ORDER OF ATTACHMENT AND TRUSTEE PROCESS

Before me is Plaintiff Nancy Batal-Sholler's supplemental motion for an order of attachment and trustee process (ECF No. 33). For the reasons stated below, the motion is **DENIED**.

### FACTUAL BACKGROUND[1]

In the 1960s, Edward B. Batal, Sr., founded the Batal Corporation (the "**Agency**"), an insurance agency in Sanford, Maine. First Am. Compl. ("**FAC**") ¶ 25 (ECF No. 41). In 1983, Ed[2] asked his daughter, Nancy Batal-Sholler, the Plaintiff, to move back to Maine and help out with the Agency. FAC ¶¶ 24, 27. In conjunction with this request, Ed promised Nancy that he would retire around the age of sixty-two and that she would then take over the business. FAC ¶ 28.

---

[1] The following factual assertions are taken from the Plaintiff's First Amended Complaint ("**FAC**") (ECF No. 41) and the affidavits and exhibits submitted in conjunction with this motion for an order of attachment and trustee process.

[2] Because several individuals involved in this case share the same last name, I refer to them by their first names to avoid confusion.

Despite Ed's promise, he told Nancy in April of 2003 that he had changed his mind about retiring at sixty-two and that he wanted to continue receiving income from the Agency. Second Aff. of Nancy Batal-Sholler ("**Nancy Aff.**") ¶ 27 (ECF No. 33-1). Ed promised Nancy that he would gift her forty percent of the company stock and, if she continued to work at the Agency, that he would sell it to her someday, once he no longer needed the income. Nancy Aff. ¶¶ 29–32, 37, 39–42.

By 2017, Ed's health was declining, as was his mental capacity. FAC ¶¶ 138, 140, 145. In the beginning of the year, Nancy and Ed's relationship was strained. FAC ¶ 138. By the middle of it, their communications had broken down irretrievably and Ed would not speak to Nancy. Nancy Aff. ¶ 83. According to Marilyn, Ed's wife of forty years and Nancy's stepmother, this break in communication occurred because Nancy upset Ed. Nancy Aff. ¶¶ 10, 83; Decl. of Marilyn Batal ("**Marilyn Decl.**") ¶ 2 (ECF No. 37). Marilyn served as a go-between for most communications between Nancy and Ed. FAC ¶ 98. Nancy believes that Marilyn worked tirelessly to convince Ed that Nancy was incompetent and incapable of running the Agency. FAC ¶ 99. According to Nancy, Marilyn disparaged her, telling Ed that she was on vacation all the time, she was not working hard enough, she should be paid less, and she should not be sold the Agency. Nancy Aff. ¶¶ 86, 95, 105. According to Marilyn, however, Ed was always the sole decisionmaker when it came to the Agency, and she had no opinion as to whether Nancy should be sold the Agency. Marilyn Decl. ¶¶ 8, 10.

On May 3, 2017, Marilyn suggested to Nancy that she make amends with her father and talk about selling the business. FAC ¶ 146. Nancy believes Marilyn was

2

trying to get her to agree to let Ed sell the Agency to a third party because it would be more profitable, and Marilyn would not have to address issues such as Ed's promise to give Nancy forty percent of the stock of the Agency. FAC ¶¶ 147–48. Marilyn, on the other hand, said she was not involved in the sale of the Agency. Marilyn Decl. ¶¶ 8–9.

In August of 2017, Nancy received an anonymous letter (seemingly from an Agency customer) inquiring about rumors that the letter writer had heard that the Agency was going to be shutting its doors. FAC ¶ 151. The letter said, "I've seen who I think is Donna and an older lady in Aroma Joe's (named [sic] Marilyn was mentioned I think. Hard to hear in there) on several occasions . . . . Neither of them had anything good to say about you or the business . . . ." Nancy Aff. ¶ 108; Anonymous Letter (ECF No. 34-4).

In November of 2017, Marilyn informed Nancy that there were potential buyers for the Agency. FAC ¶ 153. Marilyn provided information about the potential sale and told Nancy that her father could not continue paying her and that her last day of employment would be December 31st. *See* Nancy Aff. ¶¶ 109–23. In her texts to Nancy, Marilyn said that she did not like being "in the middle" of a dispute between Nancy and Ed and expressed her frustrations with Ed for yelling at her and being difficult to handle.³ *See* Nancy Aff. ¶¶ 109–10, 120–22. Nancy believes that Marilyn was lying about being stuck in the middle and that Marilyn was working behind the

---

³ Nancy was also on the receiving end of her father's anger. On December 12, 2017, she called him to try to set up an appointment "and he immediately became combative and called [her] a lazy Scottish Jew and had nothing to discuss with [her] but criticism." Nancy Aff. ¶ 118 (ECF No. 33-1).

3

scenes to ensure Nancy would not purchase the Agency. Nancy Aff. ¶ 111. Nancy says that she asked Marilyn to provide her with information about the selling price and terms of sale, but Nancy also admits that at the end of year in 2017, Marilyn told her that she should meet with Ed soon to discuss buying the Agency.[4] Nancy Aff. ¶ 112–14.

By the time Nancy left the Agency at the end of December of 2017, Ed had begun negotiations with Timothy Curley (from another insurance agency called Curley Associates) about Curley purchasing the Agency. FAC ¶¶ 172, 179. On April 13, 2018, the sale of the Agency to Curley closed. Nancy Aff. ¶ 144.

While the sale of the Agency was being negotiated, Ed and Marilyn worked with an attorney to write Ed's will and create the Batal Family Living Trust (the "**Trust**"), which Marilyn would administer. Nancy Aff. ¶¶ 137–38. On March 21, 2018, the same day the will was signed, Ed, Marilyn, and the Agency transferred most of their real estate into the Trust. Nancy Aff. ¶¶ 137, 139. Nancy was included in the will and was a beneficiary of the Trust when it was created. *See* Marilyn Decl. ¶¶ 3–4; March 2018 will 1 (ECF No. 34-9). Despite this, Nancy believes that she was "disinherited" with the execution of the Trust and the changes were made for the "sole" and "express purpose" of shielding assets from her in case she sued Ed, Marilyn, and the Agency. Nancy Aff. ¶¶ 137–40, 150, 181.

---

[4] Apparently, Nancy was able to have private communications on occasion with her father. She said that Marilyn would drive Ed to the Agency when he insisted on speaking with Nancy and the two would communicate privately in the car. Nancy Aff. ¶ 84.

4

Nancy also believes Ed changed his will and created the Trust due to Marilyn's influence. Nancy Aff. ¶ 179. Nancy says that Marilyn was extremely jealous of her and her relationship with her father, so Marilyn exploited Ed's trust, confidence, and weakened capacity to fill his head with lies about Nancy. Nancy Aff. ¶¶ 177, 179, 183–84. For example, Nancy alleges that Marilyn had an Agency employee spy on her so Marilyn could convince Ed that she was lazy and did not want to buy the Agency. FAC ¶ 280. According to Marilyn, however, Ed was always in control of their finances and estate plan, and because Ed's illness made him irritable and difficult to deal with, she would not have been able to influence him even if she tried. Marilyn Decl. ¶ 9.

Nancy alleges that around the time the Trust was created in March and April of 2018, the Defendants fraudulently transferred five properties to the Trust. FAC ¶ 199. First, on March 21, 2018, Ed conveyed his primary residence at 392 Hanson's Ridge Road in Springvale, Maine to the Trust. Nancy Aff. ¶ 151(A). Then, on April 6, 2018, Ed conveyed four more properties in Sanford, Maine to the Trust—1580 Main Street, 985 Main Street, 987 Main Street, and 1 Park Street. Nancy Aff. ¶ 151(B), (C), (E), (G). All of the transfers to the Trust were for $0.00. Nancy Aff. ¶ 151 (A), (B), (C), (E), (G).

On July 20, 2018, Nancy sued Ed in York County Superior Court, alleging various state law contract claims. Nancy Aff. ¶ 153. Three days later, Nancy obtained an *ex parte* order of attachment in the amount of $500,000 against Ed's assets, property, goods, and credits, including the five properties previously transferred to the Trust. Nancy Aff. ¶¶ 154–55. After learning of the lawsuit and the attachment,

Ed decided to amend the Trust to disinherit Nancy on August 30, 2018. Marilyn Decl. ¶ 7; First Amendment to the Batal Family Living Trust 2-1, 8-1 (ECF No. 37-3). According to Marilyn, she deferred to Ed's decision to disinherit Nancy. Marilyn Decl. ¶ 8. Ed passed away on March 24, 2019. Nancy Aff. ¶ 23.

On May 5, 2020, the state court vacated the attachment order on the ground that Nancy had not established that it was more likely than not that she would succeed on her breach of contract claim against Ed. *See* Order from York County Superior Court 6–9 (ECF No. 36-1); Nancy Aff. ¶ 165. With the attachment vacated, on October 7, 2020, the Trust sold 985 Main Street, 987 Main Street, and 1 Park Street to RBBJM Realty Trust. Nancy Aff. ¶ 151(D), (F), (H). Eight days later, Marilyn sold a condo that had not been subject to the attachment to Lion Holdings, LLC. Nancy Aff. ¶ 151(I).

On December 31, 2021, Nancy filed a Complaint in this Court alleging violations of state and federal law against Marilyn (both personally and as the personal representative of Ed's estate), the Trust, the Agency, and the Edward B. Batal Defined Contribution Plan (the "**Plan**") (together, the "**Defendants**"). Compl. (ECF No. 1). On August 15, 2022, I dismissed four RICO claims against all the Defendants and all claims against the Plan and against Marilyn in her capacity as personal representative of Ed's estate. Order on Defs.' Mot. to Dismiss 35 (ECF No. 29). I also granted the Plaintiff leave to file a supplement to her motion for an order of attachment. Order on Defs.' Mot. to Dismiss 35.

6

The Plaintiff now seeks an order of attachment and trustee process in the amount of $2,000,000 against the bank accounts, real estate, goods, and chattel of Marilyn and the Trust. Pl.'s Suppl. Mot. for Order of Attach. and Trustee Process ("**Pl.'s Mot.**") 14 (ECF No. 33).

## LEGAL STANDARD

When presented with a motion for attachment and trustee process, this Court applies Maine law pursuant to Federal Rule of Civil Procedure 64 and District of Maine Local Rule 64. *Naes Corp. v. Coastal Res. of Me., LLC*, No 1:20-cv-00201-NT, 2020 WL 7233350, at *2 (D. Me. Dec. 8, 2020). Maine law permits subsequent or additional motions for attachment after a complaint has been filed. Me. R. Civ. P. 4A(f). To obtain an attachment or an attachment on trustee process, a plaintiff must show:

> that it is more likely than not that the plaintiff will recover judgment, including interest and costs, in an amount equal to or greater than the aggregate sum of the attachment and any liability insurance, bond, or other security, and any property or credits attached by other writ of attachment or by trustee process shown by the defendant to be available to satisfy the judgment.

Me. R. Civ. P. 4A(c); *see also* Me. R. Civ. P. 4B(c). A plaintiff's motion must also be accompanied by an affidavit or affidavits setting forth "specific facts sufficient to warrant" the required findings. Me. R. Civ. P. 4A(i), 4B(c). "Maine trial courts are particularly unwilling to approve prejudgment attachments when the affidavits make clear that the merits of the dispute can only be resolved by a credibility assessment." *Eaton v. Hancock Cnty.*, No. 8-370-B-W, 2010 WL 4537751, at * 1 (D. Me. Nov. 3, 2010).

## DISCUSSION

Although twelve counts remain against the Defendants, the Plaintiff bases her motion only on her claims against Marilyn and the Trust for violating section 3579(2) of the Maine Uniform Fraudulent Transfer Act ("**MUFTA**") (Count VII) and for tortious interference with expectancy of inheritance (Count VIII). Pl.'s Mot. 2.

### I. MUFTA

The Plaintiff contends that she is entitled to an attachment on her claim that the Defendants made fraudulent transfers in violation of MUFTA. Pl.'s Mot. 8. Under MUFTA, a fraudulent transfer occurs if the transfer is made "[w]ith actual intent to hinder, delay or defraud any creditor of the debtor." 14 M.R.S. § 3575(1)(A). "[B]ecause a transferor's stated reasons for transferring assets will rarely include an explicit admission of intent to defraud creditors, the [MUFTA] provides a comprehensive, although not exclusive, list of factors to be examined when considering whether a transfer was made with the actual intent to hinder, delay, or defraud a creditor." *Morin v. Dubois*, 1998 ME 160, ¶ 5, 713 A.2d 956. These factors include whether:

> A. The transfer or obligation was to an insider;
> B. The debtor retained possession or control of the property transferred after the transfer;
> C. The transfer or obligation was disclosed or concealed;
> D. Before the transfer was made or obligation was incurred, the debtor sued or threatened with suit;
> E. The transfer was of substantially all the debtor's assets;
> F. The debtor absconded;
> G. The debtor removed or concealed assets;
> H. The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

8

> I. The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
> J. The transfer occurred shortly before or shortly after a substantial debt was incurred; and
> K. The debtor transferred the essential assets of the business to a lienor who had transferred the assets to an insider of the debtor.

14 M.R.S. § 3575(2)(A)–(K). Maine's Law Court has stated that courts may consider factors other than those listed, and any combination of factors may support a finding of actual intent. *See Dev. Specialists, Inc. v. Kaplan*, 574 B.R. 1, 5 (D. Me. 2017) (citing *FDIC v. Proia*, 663 A.2d 1252, 1254 (Me. 1995)). To succeed on a motion to attach, the moving party must show a greater than 50% chance of prevailing on a MUFTA claim. *Svenska Ortmedicinska Institutet, AB v. DeSoto*, 164 F. Supp. 2d 27, 33 (D. Me. 2001).

Here, the Plaintiff argues that she is more likely than not to prevail on her MUFTA claim. First, she asserts that the transfers to the Trust in March and April of 2018 were fraudulent because the transfers were to insiders, the debtor retained possession or control of the property transferred after the transfer, the debtor removed or concealed assets, the value of the consideration received by the debtor was not reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred, and, before the transfer was made or obligation was incurred, the debtor sued or was threatened with suit. Pl.'s Mot. 10. Specifically, Nancy alleges Marilyn retained possession of the properties as a trustee, the transfers were made without any exchange of funds, and Marilyn knew that Ed was threatened with suit prior to the transfers. Pl.'s Mot. 10.

The Defendants counter that the Plaintiff's version of events is inaccurate. They point out that although Nancy claims she was disinherited when the Trust was

created in March of 2018, in reality, Nancy was included in the will and was a beneficiary of the Trust when it was created. Defs.' Opp'n to Pl.'s Mot. for Order of Attach. and Trustee Process ("**Defs.' Opp'n**") 5 (ECF No. 36). The Defendants appear to have the correct chronology, and it is based not only on the testimony of Marilyn but also on the testimony of the Batal's estate lawyer, the will, and the trust documents. *See* Krall Dep. 9:2–9:14 (ECF No. 34-2); Marilyn Decl. ¶¶ 3–4; March 2018 will 1–2; the Batal Family Living Trust 2-1, 6-1, 6-2, 8-1 (ECF No. 37-1); First Amendment to the Batal Family Living Trust 2-1, 8-1. The Plaintiff offers little in the way of a response. "Defendants argue that the Batals transferred assets because they were upset Nancy sued Ed, but this just proves Nancy's point." Pl.'s Reply Mem. in Supp. of Suppl. Mot. for Attach. 3 (ECF No. 39). I fail to see how. The evidence that the transfers to the Trust in March and April of 2018 were originally made for Nancy's benefit sharply cuts against her chances of success on the MUFTA claim.

If Nancy's theory on the MUFTA claim is that Marilyn influenced Ed to transfer their real estate into the Trust in March and April of 2018, intending that Nancy be disinherited months later, *see* Pl.'s Mot. 10; Nancy Aff. ¶ 179, then she has only succeeded in creating a she-said/she-said dispute. *See Eaton*, 2010 WL 4537751, at *1. Because, according to Marilyn, Ed only changed his mind about Nancy's inheritance after Nancy sued them in August of 2018 and obtained an attachment on their real estate and bank accounts, leaving them strapped for cash to pay for Ed's medical costs. Defs.' Opp'n 5; *see also* Dep. of Marilyn L. Batal ("**Marilyn Dep.**") 32:13–32:21 (ECF No. 34-1); Marilyn Decl. ¶¶ 4–5. Before that, Marilyn asserts that

10

they fully intended for Nancy to inherit as one of their relatives. Marilyn Decl. ¶ 3. With these conflicting accounts, I cannot say that there is a greater than 50% chance that the Plaintiff would succeed on her claim.

The Plaintiff argues that the Trust engaged in further fraudulent transfers in October of 2018, after the state court attachment was vacated. The Plaintiff asserts that Marilyn acted with "the specific and unmistakable intent to prohibit Nancy from collecting on her claim that was ***pending in litigation***." Pl.'s Mot. 10 (emphasis in original). According to the Plaintiff, "[t]his is the essence of a fraudulent transfer" where a debtor becomes insolvent after transferring assets available to satisfy an eventual judgment in litigation. Pl.'s Mot. 10 (citing 14 M.R.S. § 3575(2)(I)).

There are issues with the Plaintiff's MUFTA claim based on the Trust's October transfers as well. First, the Plaintiff admits that the transfers were not made to insiders and that value was given. Nancy Aff. ¶ 172. Moreover, Marilyn did not retain control over the properties as personal representative of the Trust after the transfers, and the Plaintiff does not allege that Marilyn absconded. Marilyn Decl. ¶ 13. Another problem for the Plaintiff is that the transfers were not concealed from her; in fact, she consented to the sale of 985 Main Street. Marilyn Decl. ¶ 11; Counsel Communications (ECF No. 37-4); Assented to Mot. to Modify Order of Attachment (ECF No. 37-5). And there are non-fraudulent explanations for the transfers: the properties were sold because the town of Sanford was pursuing the elimination of vacant buildings and the properties were vacant and one had flood damage. Marilyn Decl. ¶ 12; *see Irving Tanning Co. v. Kaplan*, 876 F.3d 384, 393 (1st Cir. 2017)

11

(upholding bankruptcy court's finding that defendants had no fraudulent intent when there was ample evidence of non-fraudulent reasons for the transfer). Considering these factors, I cannot find that the Plaintiff is more likely than not to succeed on her MUFTA claim.[5]

## II. Tortious Interference with Expectancy of Inheritance

The Plaintiff further contends that she is entitled to an order of attachment because she is more likely than not to succeed on her claim for tortious interference with expectancy of inheritance. Pl.'s Mot. 11. To make out a prima facie case of tortious interference with expectancy of inheritance, a plaintiff must show:

> (1) the existence of an expectancy of inheritance; (2) an intentional interference by a defendant through tortious conduct, such as fraud, duress, or undue influence; (3) a reasonable certainty that the expectancy of inheritance would have been realized but for the defendant's interference; and (4) damage resulting from that interference.

*Morill v. Morrill*, 1998 ME 133, ¶ 7, 712 A.2d 1039.

Here, the Plaintiff argues that she had an expectancy of inheritance and Marilyn intentionally interfered with it through tortious conduct—specifically, that the changes to Ed's will were a product of Marilyn's undue influence. Pl.'s Mot. 12–13. "Undue influence is defined as unfair persuasion of a party who is under the

---

[5] Although it is not clear from the First Amended Complaint or the Motion for Attachment, Nancy also appears to challenge the transfers of Ed's one-half interest in a property in February of 2019 and the condominium at 952 Post Road on October 15, 2020. It appears that the 2019 transfer only involved Ed, so it is irrelevant to any claims against Marilyn or the Trust. *See* Nancy Aff. ¶ 151(J). With respect to the property at 952 Post Road, the Plaintiff has failed to show that she would be likely to prevail on a MUFTA claim for many of the same reasons that the other transfers failed—it was not made to insiders, there was value paid, and Marilyn did not retain control over the property. Additionally, Marilyn made the October 2020 transfer in her capacity as personal representative of Ed's estate, and I dismissed all claims against Marilyn in that capacity. *See* Nancy Aff. ¶ 151(I).

domination of the person exercising the persuasion or who by virtue of the relationship between them is justified in assuming that that person will not act in a manner inconsistent with his welfare." *Cote v. Cote*, 2016 ME 94, ¶ 14, 143 A.3d 117 (quoting *Theriault v. Burnham,* 2010 ME 82, ¶ 6, 2 A.3d 324). If a plaintiff shows by a preponderance of the evidence that a confidential relationship existed between the decedent and the defendant, then undue influence is presumed. *Id.* A confidential relationship exists when (1) the decedent placed trust and confidence in the defendant; and (2) "there was a great disparity of position and influence in the relationship." *Theriault,* 2010 ME 82, ¶ 6, 2 A.3d 324.

The Defendants admit that Ed placed trust and confidence in Marilyn, Defs.' Opp'n 8, but "a finding of great disparity of position and influence remains a necessary prerequisite to a determination that a confidential relationship exists, even where the parties are related." *Sylvester v. Benjamin*, 2001 ME 48, ¶ 8, 767 A.2d 297. The Defendants argue that it is not more likely than not that the Plaintiff could succeed in proving a great disparity in position between Ed and Marilyn. Defs.' Opp'n 8. They further contend that Ed had his own reasons for disinheriting Nancy outside of Marilyn's influence.[6] *See* Defs.' Opp'n 9–10.

This claim also boils down to credibility issues not resolvable on a motion to attach. *See Dablo v. Clark*, No. 2:15-cv-249-JAW, 2015 WL 8664223, at *2 (D. Me. Dec. 11, 2015). To start, there is conflicting evidence regarding whether Ed had his

---

[6]     The Defendants do not challenge the Plaintiff's contention that Nancy had an expectancy of inheritance. *See* Pl.'s Suppl. Mot. for Order of Attach. and Trustee Process 13 (ECF No. 33); Defs.' Opp'n to Pl.'s Mot. for Order of Attach. and Trustee Process 8–9 (ECF No. 36).

13

own problems with Nancy and would have disinherited her without Marilyn's influence. The Plaintiff relies on her belief and the anonymous letter to show that Marilyn did not like her and was controlling everything Ed did. *See* Nancy Aff. ¶¶ 108, 177, 179, 183–84. Marilyn, however, stated that Ed said Nancy was not doing her job, was always going on vacation without telling him, was not interested in insurance, and would resell the Agency if she bought it. Marilyn Dep. 10:10–10:16; 28:19–28:23; 43:14–43:21. Marilyn also said that Ed saw the Agency's profits going down under Nancy and that he repeated "over and over" for four or five years that he was afraid he would not be paid if he sold the Agency to Nancy. Marilyn Dep. 24:24–25:5; 48:9–48:11. Marilyn's version is corroborated by Ed's lawyer, Jessie Krall, who said that Ed spoke about his worries about Nancy paying him and the declining profits, in addition to his desire to sell the Agency to someone like Curley who would carry on his legacy by providing clients with similar service. Dep. of Jessie L. Krall ("**Krall Dep.**") 81:2–82:9; 85:8–85:17.

There are also conflicting accounts about the disparity of position and influence between Marilyn and Ed. In Nancy's version, witnesses described the last year of Ed's life "in negative terms regarding his capacity" and said he was "confused." Pl.'s Mot. 11–12. According to Marilyn, Ed was confused, his memory was getting worse, and "he wasn't always sure when he was talking what he was really saying," but this was only "on occasion" because his health issues were related to his diabetes. Marilyn Dep. 11:1–11:9; Marilyn Texts 4 (ECF No. 34-3). As such, he would not be at full capacity if his blood sugar was too high or too low, but "[w]hen his sugar was normal,

he was as normal as can be." Marilyn Dep. 11:18–11:22. Krall echoed this assessment, saying that Ed "had good days and he had really bad days." Krall Dep. 19:8. A bad day meant that he had to use a wheelchair and would be tired and a bit confused and a good day meant he was "totally lucid" and could walk with a cane. Krall Dep. 19:10–19:18. Krall did not have concerns about Ed's competency until October of 2018, after Nancy was disinherited. Krall Dep. 35:7–36:1.

Marilyn's telling also conflicts with Nancy's claim that Marilyn was able to take advantage of Ed's illness to poison his mind against Nancy. Marilyn testified that when Ed was having a bad day, he was difficult, unpredictable, and "wanted to be aggravating." *See* Marilyn Dep. 54:3–54:12; 82:21–82:23. Marilyn's text messages state that Ed was "grumpy" and "a grouch," would holler at her all the time, and would change his mind frequently, so she did not "know what to do with him" because "[h]e just gets to be a wreck when we talk." Marilyn Texts 1–4. Because of Ed's irritability,[7] Marilyn claims that she was *less* able to weigh in on their personal finances as time went on. Marilyn Decl. ¶ 9.

Finally, the stories diverge on whether Marilyn tried to influence Ed at all. Nancy believes that Marilyn was pulling the strings to disinherit her. Nancy Aff. ¶¶ 137, 179. But Marilyn testified that Nancy and Ed's problems were their own and she acted as a go-between because Ed and Nancy could not speak to each other peacefully. Marilyn Dep. 32:12–32:21; 33:2–33:4. Marilyn felt "terrible" being stuck

---

[7] Ed's cantankerousness is the one thing that Nancy and Marilyn seem to agree on. Nancy complained to Marilyn in texts that Ed would become combative, call her names, yell at her, and criticize her. Marilyn Texts 3 (ECF No. 34-3).

15

in the middle, apologized for how Ed treated Nancy, and told Nancy she loved her and hoped things could be resolved. Marilyn Dep. 32:12–32:21; Marilyn Texts. She said that Ed was the sole decision-maker on issues regarding Nancy and was the primary decision-maker with respect to their personal finances, and she was able to weigh in less as he grew sicker. Marilyn Decl. ¶¶ 8–9. When Ed decided to disinherit Nancy, Marilyn claims she had no opinion and deferred to his decision.[8] Marilyn Decl. ¶¶ 8, 10.

Altogether, the evidence here paints two very different pictures. In Nancy's view, her father's mental capacity was significantly weakened, and Marilyn took advantage of his confusion to turn him against Nancy and disinherit her, something he would not otherwise have done. As Marilyn tells it, she was not an evil stepmother, but a caretaker dealing with an ornery old man who fought with his daughter and whom she could not influence even if she tried. Based on these competing narratives, I cannot find that it is more likely than not that the Plaintiff will prevail against the Defendants in the amount she seeks.

## CONCLUSION

For the reasons stated above, the Plaintiff's motion for an order of attachment and trustee process (ECF No. 33) is **DENIED**.

---

[8] The evidence of Ed's difficult moods, control over most decision-making, and disregard for Marilyn's input also weakens the argument that there was great disparity of position between Marilyn and Ed. *See Sylvester v. Benjamin*, 2001 ME 48, ¶ 10, 767 A.2d 297 (upholding trial court's finding that there was not a disparity of position between decedent and his sister when he had a "strong streak of independence"); *Cote v. Cote*, 2016 ME 94, ¶ 16, 143 A.3d 117 (upholding trial court's finding that there was undue influence when two of the decedent's children "had nearly unfettered control over essential aspects of their elderly mother's life" including her finances).

16

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 28th day of February, 2023.